**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| **JULIUS DONTARIO BECKLES** | |
| Plaintiff, | |
| v. | **Civil Action No.: 8:21-CV-00234-GJH** |
| **KIMBERLY BATTLE, et al,** | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KIMBERLY BATTLE,
YONAS SISAY, M.D., CHANTAL TCHOUMBA, NP, YVETTE LEDJO, NP,
LIBERATUS DEROSA, M.D., KASAHUN TEMESGEN, M.D., JANET MIJERE, NP
AND BOLAJI ONABAJO, MD'S MOTION TO DISMISS
OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Defendants Kimberly Battle, Yonas Sisay, M.D., Chantal Tchoumba, NP, Yvette Ledjo, NP, Liberatus DeRosa, M.D., Kasahun Temesgen, M.D., Janet Mijere, NP and Bolaji Onabajo, M.D. ("Defendants"),[1] by undersigned counsel, hereby submit this Memorandum of Law in support of their Motion to Dismiss or Alternatively for Summary Judgment.

## I. STATEMENT OF FACTS

### A. Plaintiff's Allegations

Julius Dontario Beckles ("Plaintiff"), an inmate incarcerated by the Maryland Department of Public Safety and Correctional Services ("DPSCS") claims that Defendants provided inadequate treatment for his complaints of pain, which arose prior to his incarceration. CM/ECF No. 1, P. 4. Plaintiff claims he sought care beginning on February 26, 2018. *Id.* at 6. He alleges vaguely that he "sought help" from Kimberly Battle and submitted numerous sick calls

---

[1]Undersigned counsel represents Defendants for any allegations arising on or after January 1, 2019, the date that Corizon replaced Wexford Health as the contracted health care provider for the DPSCS.

and made complaints of medical staff of lower body numbness and falling. Plaintiff claims that he also complained to Dr. Yonas Sisay, NP Chantal Tchoumba, and NP Yvette Ledjo while incarcerated at Maryland Correctional Institute – Jessup ("MCIJ"). *Id*.

Plaintiff claims that, following a transfer, he met with Dr. Temesgen and Dr. DeRosa and that he was subsequently placed on Gabapentin despite his reports that the medication didn't work for him. *Id*. at 7. Plaintiff alleges they suggested Tramadol but he informed them that Tramadol was also ineffective. He claims he was placed on Tramadol anyway. Plaintiff claims Dr. DeRosa informed him that "CMCF didn't do pain management." *Id*.

Plaintiff claims that, following his November 18, 2020 transfer to DRCF, Dr. Bolaji Onabajo informed him that he would talk to someone about his complaints of pain. *Id*. at 8. Plaintiff claims Dr. Onabajo saw him "three times to no avail." Plaintiff claims NP Janet Mijere saw him and informed him that his pain complaints "were not her concern." *Id*.

Plaintiff further alleges that he "believe[s] that retaliation has been taken place." *Id*. at 9. However, he does not specify exactly who retaliated against him, the reason for said retaliation, or the purported retaliatory acts. *Id*.

In relief, Plaintiff seeks monetary relief and "medical care and medication adequate for [his] injuries." *Id*. at 5.

Since filing his initial Complaint, Plaintiff has also continued to file multiple correspondence to the Court, in which he alleges a variety of allegations. In a March 24, 2021 letter, Plaintiff alleges that Dr. Onabajo and PA Mijere refused to address his "other medical needs." CM/ECF No. 6, P. 2. Plaintiff again alleges he "encounter[ed] retaliation" but again failed to allege specific retaliatory acts. *Id*. at 1-3. In supplements dated April 26, 2021, May 11, 2021, and June 3, 2021, Plaintiff claims he was provided with incorrect instructions prior to a

procedure and that, as a result, he suffered pain during the procedure. CM/ECF No. 8; CM/ECF No. 12; CM/ECF No. 20. Plaintiff does not allege that any Defendant provided the purportedly incorrect instructions or was aware of any risk to Plaintiff's health in connection with the procedure *Id.*

## B.    Role of Defendants

Dr. Sisay is a medical doctor who treated Plaintiff at MCIJ. Exhibit A: Declaration of Dr. Yonas Sisay ¶ 2. Chantal Tchoumba and Yvette Ledjo are Nurse Practitioners ("NP") who treated Plaintiff while he was incarcerated at MCIJ. *See, e.g.,* Exhibit A-1: BECKLES MR-203, 252-53. Kimberly Battle is a Registered Nurse who was employed as the Assistant Director of Nursing at MCIJ. Exhibit B: Declaration of Kimberly Battle ¶ 2. Ms. Battle supervised the nursing staff and responded to informal complaints raised by inmates. *Id.* She did not directly treat Plaintiff. *Id.* ¶ 3. Ms. Battle did not have the authority to prescribe medications, dictate the course of a patient's treatment, request off-site specialty care, or request consultations with the pain management panel. *Id.* ¶ 5. She also did not schedule appointments with the pain management panel and could not dictate the schedules of the members of the pain management panel. *Id.*

Dr. Liberatus DeRosa is a medical doctor who treated Plaintiff at Central Maryland Correctional Facility. *See, e.g.*, Ex. A-1: PP. 293-95. Dr. Kasahun Temesgen is a medical doctor who was involved in treating Plaintiff's complaints of pain. *Id.* at 398-99.

Dr. Bolaji Onabajo is a medical doctor who treated Plaintiff at Dorsey Run Correctional Facility ("DRCF"). Exhibit C: Declaration of Dr. Bolaji Onabajo ¶ 2. Janet Mijere is a Certified Registered Nurse Practitioner ("NP") who treated Plaintiff at DRCF. *See id.* ¶ 7.

**C.      Plaintiff's Medical Care**

Plaintiff is a 49-year-old African-American male with a history of hypertension, benign prostatic hyperplasia ("BPH"), chronic back pain, and polysubstance abuse, including daily use of heroin, cocaine, and alcohol prior to his incarceration. He was assessed as having polysubstance abuse and treated for withdrawal symptoms on February 23, 2018.  Exhibit A-1: BECKLES MR-3, 25.

Plaintiff was transferred to MCIJ in or around September 24, 2018. Ex. A-1: PP. 87-89. Though Plaintiff requested a steroid shot for his lumbar spine in or around October 1, 2018, he later refused a steroid injection. *Id*. at 93-95, 104.

Dr. Sisay first saw Plaintiff on October 18, 2018. Ex. A-1: PP. 106-08. Plaintiff reported a history of a herniated disc that encroached upon an exiting nerve root and spinal stenosis (narrowing of the spaces within the spine, which can put pressure on the nerves that travel through the spine). Dr. Sisay noted that Plaintiff had recently refused a steroid injection. Upon examination, Plaintiff appeared to be in no apparent distress and he exhibited no significant lumbar spine physical findings. Dr. Sisay prescribed Indocin (a nonsteroidal anti-inflammatory drug, or NSAID) for Plaintiff and discontinued Mobic (a different NSAID) and advised Plaintiff to do exercises for low back pain. Dr. Sisay also renewed Plaintiff's prescriptions for Baclofen (a muscle relaxer) and Lidocaine patch (a topical pain medication). Plaintiff also had a prescription for Amitriptyline for nerve pain. Dr. Sisay also provided an accommodation for a bottom bunk. *Id*.

Amitriptyline is a tricyclic antidepressant that is used to treat depression and mood disorders. Amitriptyline may also be used to treat other conditions, including nerve pain and back pain. Ex. A: ¶ 8.

4

To the extent Plaintiff complains that Dr. Sisay did not prescribe opioid pain medications for him, Dr. Sisay did not believe opioid medications were medically indicated at this appointment. Ex. A: ¶ 9. While opioid and opioid-like pain medications may be effective analgesics, their widespread use has caused significant public health problem that confounds their clinical utility. Prescription opioid use can lead to substance use disorder. *Id*. Side effects of opioids include psychological and physical addiction, particularly in patients such as Plaintiff with a history of addiction and substance abuse. Long term use of opioids leads to tolerance (the longer one uses the opioid medication, the less effective it becomes and higher dosages are required), dependence, and addiction. *Id*. ¶ 10. These issues have led to severe ailments, loss of life, and a nationwide opioid epidemic. *Id*.

In 2016, in response to the national opioid epidemic, the Centers for Disease Control ("CDC") developed guidelines for prescribing opioids for chronic pain to improve care and reduce risk of opioid use disorder and overdose. Ex. A: ¶ 11. The guidelines recommend that non-opioid therapy is preferred for chronic pain outside of active cancer, palliative, and end of life care. It also advises to consider ways to manage pain that do not include opioids, such as physical therapy, exercise, non-opioid medications, such as acetaminophen or ibuprofen. In addition, in 2018, the Journal of the American Medical Association published an investigation which showed that treatment with opioids was not superior to treatment with non-opioid medications for improving pain-related function. The results of the investigation did not support initiation of opioid therapy for moderate to severe chronic back pain or hip or knee osteoarthritic pain. *Id*. Further, as opposed to the previous clinical practice that contributed to the opioid epidemic, the prevailing CDC recommendation of pain management in most cases is not focused on elimination of pain altogether but to reduce pain intensity and prioritize pain-related

5

functional impairment or minimizing risk of opioid related harms. *Id*. ¶ 12. The correctional setting also compounds the problem of use of opioids with diversion, contraband trading, and use in suicide attempts. *Id*. ¶ 13. Patients may also become a target of violence or other manipulation to obtain access to Plaintiff's drugs. At MCIJ, when indicated, medical providers consult a pain management panel and a clinical pharmacist. A patient participates in this process. Opioids are used as last resort in chronic pain management. *Id*.

Because of the chronic nature of patient's back pain, prevailing treatment guidelines, risks of long-term use of opioid medications, along with Plaintiff's history of poly-substance abuse, Dr. Sisay did not believe that opioid medications were appropriate for Plaintiff at that time. Ex. A: ¶ 13. It was Dr. Sisay's medical opinion that non-opioid pain medications were appropriate for Plaintiff's complaints of chronic lumbar pain and that Plaintiff did not exhibit any alarming physical finding and had no  impairment in his activities of daily living. *Id*.

On November 27, 2018, orthopedist Dr. Lawrence Manning saw Plaintiff for his lower back complaints. Ex. A: ¶ 15; Ex. A-1: P. 119. Dr. Manning noted that Plaintiff was in no acute distress and had a normal gait and erect posture. Plaintiff reported intact sensation in his legs and exhibited a normal heel/toe walk (inability to perform this walk may indicate issues with the L4-L5 levels of the lumbar spine and S1 level of the sacral spine). Plaintiff exhibited right lumbar paravertebral tenderness and a positive straight leg raise (which may indicate nerve root irritation in the lumbar spine) at 70 degrees bilaterally. He referred Plaintiff to a spinal surgeon and recommended a CT scan of the lumbar spine. There was no recommendation made for the use of narcotics. *Id*.

On December 12, 2018, orthopedic surgeon Dr. Ashok Krishnaswamy saw Plaintiff and recommended continuation of Motrin, physical therapy and a CT scan with contrast. After these,

he advised referring patient for neurosurgery consultation. No narcotics were advised on the visit. Ex. A-1: P. 579.

On December 21 2018, a provider saw Plaintiff, who requested a feed-in accommodation for meals delivered to his cell. Ex. A-1: P. 124. The provider noted that Plaintiff exhibited a steady gait and no limb weakness. He was advised to move around and that he would not benefit from prolonged feed in accommodation and he was given feed in only for two days. The provider offered Plaintiff Ibuprofen and Capsaicin (a topical pain medication) but he refused both. *Id*.

On January 8, 2019, Plaintiff underwent a physical therapy consultation. Ex. A-1: PP. 140-41. Plaintiff reported no relief of pain with his medication regimen but appeared comfortable. Plaintiff exhibited no limitation of movement and had full range of motion with a steady gait. The therapist recommended six sessions. *Id*.

Plaintiff underwent physical therapy on January 10, 2019. Ex. A-1: P. 142. On January 15, 2019, Plaintiff failed to appear for physical therapy. Ex. A-1: P. 145. On January 17, 2019, Plaintiff underwent physical therapy and reported feeling better. Ex. A-1: P. 146. On January 22, 2019, Plaintiff underwent physical therapy. He reported minimal numbness a couple days ago but stated that it did not last. Ex. A-1: P. 147. On January 24, 2019, Plaintiff underwent physical therapy and reported feeling a lot better. Ex. A-1: P. 148. On January 29, 2019, Plaintiff Plaintiff failed to appear for physical therapy. Ex. A-1: P. 149. On January 31, 2019, Plaintiff underwent physical therapy and reported feeling a lot better. Ex. A-1: P. 150.

On February 5, 2019, Dr. Sisay saw Plaintiff, who reported that his pain was controlled with his current medication regimen and that physical therapy helped a lot. Ex. A: ¶ 26; Ex. A-1: PP. 154-56. Plaintiff denied limb weakness or incontinence (which can be an indication of

7

lumbar spine issues requiring urgent intervention). Upon examination, Plaintiff appeared to be in no apparent distress and exhibited no back or spine abnormalities. Dr. Sisay renewed Plaintiff's medications. *Id*.

On February 7, 2019, Plaintiff underwent physical therapy and reported feeling a lot better. Ex. A-1: P. 159.

On February 11, 2019, Plaintiff underwent a CT scan of his lumbar spine which showed suggestions of severe central canal stenosis and multi-level broad-based disc bulges. Ex. A-1: PP. 223-24.

On or about February 19, 2019, Plaintiff was transferred to Baltimore City Correctional Center ("BCCC"). Ex. A-1: PP. 160-62. A doctor at BCCC saw Plaintiff in chronic care. Plaintiff reported that physical therapy helped his complaints of back pain. *Id*.

On April 5, 2019, Plaintiff was brought to the medical unit because he was found to be high with probable use of K2, a synthetic cannabinoid. Ex. A-1: PP. 170-71. On June 6, 2019, Plaintiff was brought to the medical unit on suspicion of taking illegal substances and he was transferred to a single cell for observation. Ex. A-1: P. 178. On July 6, 2019, Plaintiff was brought to the medical unit by officers on suspicion of taking illegal substances and he was placed in a holding cell for close observation. Ex. A-1: P. 185.

On or about September 15, 2019, Plaintiff was transferred back to MCIJ. Ex. A-1: PP. 192-95.

On October 1, 2019, Dr. Sisay saw Plaintiff, who reported that his pain was markedly controlled after physical therapy and with his current medication regimen. Ex. A-1: PP. 197-99. Plaintiff denied limb weakness or incontinence. Upon examination, Plaintiff exhibited no

significant lumbar spine physical findings. Dr. Sisay renewed Plaintiff's pain and other medications and advised him to continue exercises for low back pain. *Id*.

On October 24, 2019, November 6, 2019, November 18, 2019, and December 26, 2019, NP Tchoumba saw Plaintiff for various medical complaints. Ex. A-1: PP. 203-08, 221-22. Plaintiff did not express complaints of lower back pain at these appointments.

On January 8, 2020, Dr. Sisay saw Plaintiff, who reported that his pain was markedly controlled after physical therapy and with his current medication regimen. Ex. A-1: PP. 229-31. Upon examination, Plaintiff exhibited no significant lumbar spine physical findings. Dr. Sisay renewed Plaintiff's medications and advised him to continue exercises for lower back pain. *Id*.

On February 10, 2020, NP Tchoumba saw Plaintiff for requests to be taken off Flomax and Cardura (medications used to treat enlarged prostate problems). Ex. A: ¶ 35; Ex. A-1: PP. 238-39. Plaintiff expressed no musculoskeletal complaints. *Id*.

On February 20, 2020, NP Tchoumba saw Plaintiff for complaints of pain in the left hip and calves. Ex. A-1: PP. 240-41. Plaintiff reported that Baclofen, Indomethacin, and Amityiptyline were ineffective. Upon examination, NP Tchoumba noted no redness, swelling, or deformity. Plaintiff limped but NP Tchoumba noted no impaired activities of daily living. NP Tchoumba prescribed Mobic in place of Indomethacin, advised Plaintiff as to do routine stretching exercises, and ordered a hip x-ray. *Id*.

On February 21, 2020, Plaintiff underwent a left hip x-ray which showed moderate degenerative changes in bilateral hip joints, which indicates arthritis in the joints. Ex. A: ¶ 37; Ex. A-1: P. 307.

On March 1, 2020, a provider noted that Plaintiff had normal range of motion in his left hip and no tenderness on palpation of the left hip. Ex. A: ¶ 38; Ex. A-1: PP. 242-43. The

provider ordered Biofreeze (a topical pain medication). After it was reported that Plaintiff did not receive Biofreeze, Dr. Sisay approved the medication on behalf of the regional medical director and requested the medication. Ex. A: ¶ 39; Ex. A-1: PP. 245-48.

On March 19, 2020, Dr. Sisay saw Plaintiff, who reported that his pain was not fully controlled. Ex. A: ¶ 40; Ex. A-1: PP. 249-51. Plaintiff denied limb weakness or incontinence. Upon examination, Plaintiff was in no apparent distress and he exhibited no acute tenderness or swelling in the hip joint, though he exhibited limitation of movement in the left joint with flexion and rotational movements. The mainstay of arthritis treatment (degenerative joint disease) is treatment with NSAIDs and Mobic is an NSAID. Based on his examination, Dr. Sisay believed that doubling Plaintiff's Mobic and continuing the rest of Plaintiff's current regimen of pain medications, which included Amitriptyline, Biofreeze and Baclofen, was appropriate for his condition. *Id*.

On March 26, 2020, NP Yvette Ledjo saw Plaintiff, who reported pain in his hips, knees, and back. Ex. A-1: PP. 252-53. NP Ledjo discontinued Elavil and prescribed Cymbalta (an antidepressant and nerve pain medication). *Id*.

On April 16, 2020, NP Ledjo renewed Plaintiff's medications. Ex. A-1: P. 254.

On April 23, 2020, NP Ledjo saw Plaintiff, who reported that his pain improved with Cymbalta. Ex. A-1: PP. 257-58.

On May 15, 2020, NP Ledjo saw Plaintiff for a toenail complaint. Ex. A-1: PP. 257-58.

On May 28, 2020, Dr. Sisay saw Plaintiff, who reported that his current medication regimen was helping. Ex. A-1: PP. 259-60. Dr. Sisay renewed Plaintiff's medications and advised Plaintiff to continue low back pain exercises. *Id*.

On July 11, 2020, NP Ledjo saw Plaintiff for complaints of hip pain. Ex. A-1: PP. 262-63. NP Ledjo renewed Plaintiff's accommodation for a bottom bunk and prescribed glucosamine chondroitin (a supplement that may help for cartilage deterioration in the joints). *Id*.

On July 25, 2020, NP Ledjo saw Plaintiff for complaints of constipation. Ex. A-1: PP. 264-65. Plaintiff expressed no musculoskeletal complaints. *Id*.

On July 29, 2020, Dr. Sisay saw Plaintiff who reported that his current medication regimen was helping. Ex. A-1: PP. 267-69. Dr. Sisay renewed Plaintiff's medications and advised Plaintiff to continue low back pain exercises. *Id*.

On August 13, 2020, NP Ledjo saw Plaintiff for complaints related to a high blood pressure medication. Ex. A-1: PP. 272-73.

On August 29, 2020, NP Ledjo saw Plaintiff regarding his BPH complaints. Ex. A-1: PP. 274-75.

On September 4, 2020, NP Ledjo saw Plaintiff, who requested an increase of pain medications. Ex. A-1: PP. 276-77. NP Ledjo reviewed Plaintiff's current pain medications. Upon examination, Plaintiff was in no apparent distress and exhibited normal musculature and no skeletal tenderness or joint deformity. NP Ledjo educated Plaintiff, discussed the benefits Plaintiff's prescribed medications, and advised him to continue current medications and return to clinic if his condition worsened or there was no improvement. *Id*.

On September 14, 2020, NP Ledjo saw Plaintiff, who requested an increase in pain medications. Ex. A-1: PP. 278-79. NP Ledjo noted that she would request a copy of Plaintiff's CT scan results and review it for a potential consultation with the pain management panel. *Id*.

On October 5, 2020, NP Ledjo saw Plaintiff to review his CT scan. Ex. A-1: PP. 282-83. NP Ledjo requested a pain management consultation and also submitted a behavioral health

request based on Plaintiff's threat to "get medical attention by all mean including jumping from the top." *Id*. at 280-85.

On October 6, 2020, NP Ledjo prescribed Tylenol. <u>Ex. A-1</u>: PP. 286-87.

On October 7, 2020, Plaintiff was evaluated for pain management by the clinical pharmacist, who recommended prescription of Tylenol (or acetaminophen) based on Plaintiff's report that it was helpful. <u>Ex. A-1</u>: PP. 288-89. The panel noted that Plaintiff was on maximum dosages of Cymbalta, Mobic, and Baclofen. *Id*.

Ms. Battle, the ADON at MCIJ, does not specifically recall any interactions with Plaintiff, including any conversations or correspondence pertaining to Plaintiff's treatment for his complaints of pain and/or lumbar complaints. <u>Ex. B</u>: ¶ 6. If Plaintiff had brought a complaint to her attention, Ms. Battle would have investigated Plaintiff's complaint and attempted to address his complaint by notifying the appropriate party, such as a physician, of the nature of Plaintiff's complaint. To the extent Plaintiff claims that Ms. Battle informed him that a consultation with the pain management panel had been canceled, she did not have any authority regarding any aspect of the pain management panel. If Ms. Battle had informed Plaintiff that a consultation with the pain management panel had been canceled, she would have also advised him to follow up with his primary care provider, who would have been able to formulate a plan of treatment to address any outstanding complaints. Ms. Battle was not aware of any medical complaints of Plaintiff which were not addressed by his primary care providers. *Id*.

On or about October 21, 2020, Plaintiff was transferred to Central Maryland Correctional Facility. <u>Ex. A-1</u>: PP. 293-95.

On October 21, 2020, Dr. DeRosa saw Plaintiff in chronic care. <u>Ex. A-1</u>: PP. 293-95. Plaintiff reported pain in his lumbar spine, calf, knee, hip, and left leg. Dr. DeRosa increased

Plaintiff's Baclofen and acetaminophen prescriptions, continued Cymbalta, glucosamine chondroitin, and Mobic, and noted he would reevaluate Plaintiff in three weeks to assess the effect of these adjustments. *Id*.

On October 26, 2020, Dr. DeRosa reviewed Plaintiff's laboratory testing results and noted only minor abnormalities. Ex. A-1: P. 296.

On November 3, 2020, Dr. Muleta Obsu noted that Plaintiff requested to be transferred to another facility for pain management. Ex. A-1: PP. 298-99.

On November 16, 2020, Dr. DeRosa saw Plaintiff for complaints of a rash on his scalp and difficulty urinating. Ex. A-1: PP. 300-01. Plaintiff expressed no musculoskeletal complaints.

On November 18, 2020, Dr. DeRosa had a telemed meeting with Dr. Temesgen and Dr. Sisey to discuss Plaintiff's pain management regimen. Ex. A-1: PP. 302-03. The physicians determined to stop Cymbalta and prescribe Elavil instead and increase Neurontin. They also planned to transfer Plaintiff to a location where controlled substances could be given. Plaintiff was also willing to try Lyrica as a next step and consider Tramadol if Lyrica was unsuccessful. *Id*.

Plaintiff was transferred to DRCF on November 18, 2020. Ex. A-1: PP. 310-11.  On December 8, 2020, following his release from quarantine, NP Mijere saw Plaintiff and requested a chronic care appointment to address management of his pain complaints. Ex. A-1: PP. 354-59.

On December 16, 2020, NP Mijere saw Plaintiff for concerns pertaining to a scalp rash, BPH, and gastrointestinal reflux disease. Ex. A-1: PP. 360-61. Plaintiff expressed no musculoskeletal complaints. NP Mijere prescribed Omeprazole, Dutasteride, and Dandruff Shampoo for Plaintiff. *Id*.

On December 21, 2020, Dr. Onabajo saw Plaintiff for the first time in chronic care. Ex. A-1: PP. 365-69. Plaintiff reported chronic back pain radiating to his bilateral lower extremities and difficulty standing for a prolonged period. He also stated that he had been transferred to DRCF after exhausting all non-opioid pain medication options. Upon examination, Plaintiff reported posterior tenderness of the lumbar spine. Plaintiff declined Lyrica due to its side effects, so Dr. Onabajo offered Tramadol (an opioid-like pain medication), which he offered to adjust until Plaintiff's pain was controlled. Plaintiff accepted this course of treatment. Dr. Onabajo also renewed Plaintiff's other medications, including Baclofen and glucosamine chondroitin. *Id*. Dr. Onabajo also requested a neurosurgical consultation for Plaintiff. Ex. A-1: PP. 362-64.

Due to the risks associated with opioid and opioid-like pain medications, it is appropriate to initially prescribe these medications at lower dosages to assess a patient's response to them and adjust as necessary. Ex. B: ¶ 12.

On December 28, 2020, NP Mijere saw Plaintiff for complaints of allergies. Ex. A-1: PP. 370-71. He reported Nasacort helped relieve allergies, so she prescribed Nasacort for him. *Idi.*

On December 30, 2020, NP Mijere saw Plaintiff for work clearance. Ex. A-1: PP. 372-73. She placed him on light activity work status. *Id*.

On December 31, 2020, Dr. Onabajo saw Plaintiff, who stated that Tramadol was not working for him. Ex. A-1: PP. 374-75. Dr. Onabajo offered to stop the medication, adjust it, or refer Plaintiff back to the pain management panel. Plaintiff accepted an increased dosage. *Id*.

On January 6, 2021, NP Mijere saw Plaintiff for complaints of back pain and noted that Plaintiff was waiting to be seen by the pain management panel. Ex. A-1: PP. 376-77. NP Mijere prescribed a topical analgesic for Plaintiff. Plaintiff also complained of darkening of his left great

14

toe for which NP Mijere prescribed Lamisil. *Id*. Plaintiff later refused the topical analgesic. *Id*. at 384.

On January 12, 2021, NP Mijere prescribed Mobic for Plaintiff at his request. Ex. A-1: P. 393.

On January 13, 2021, Dr. Onabajo noted that Plaintiff's neurosurgical consult was approved. Ex. A-1: PP. 380-81.

On February 2, 2021, NP Mijere saw Plaintiff, who reported that his pain medication was not working. Ex. A-1: PP. 385-86. Because Plaintiff's pain medications exceeded the scope of NP Mijere's practice, she referred Plaintiff to the chronic care clinic. *Id*.

On February 4, 2021, Dr. Onabajo saw Plaintiff, who reported that Tramadol was ineffective. Ex. A-1: PP. 389-90. Upon examination, Plaintiff exhibited decreased lumbar mobility and paravertebral muscle spasms. Plaintiff also complained of posterior tenderness. Dr. Onabajo noted that Plaintiff would be scheduled for a meeting with the pain management panel. *Id*.

On February 17, 2021, Dr. Onabajo, Dr. Kasahun Temesgen, and a clinical pharmacist discussed Plaintiff's pain medication regimen. Ex. A-1: P. 397. The clinical pharmacist offered Cymbalta, but Plaintiff stated it did not work. When asked about Mobic, Plaintiff stated that it was for his hip pain. Dr. Temesgen recommended Tylenol #3 (a narcotic medication) pending a neurosurgical evaluation. *Id*.

On February 22, 2021, Dr. Onabajo requested a CT scan with contrast of Plaintiff's lumbar spine. Ex. A-1: PP. 402-03.

On March 2, 2021, Dr. Onabajo discussed Plaintiff's laboratory testing results with him. Ex. A-1: PP. 406-07.

On March 25, 2021, Dr. Neal Naff saw Plaintiff for complaints of back pain, lower extremity pain, and gait dysfunction. Ex. A-1: PP. 933-35. Plaintiff reported aching throbbing pressure at 8/10 radiating to the right side, buttock, hip and, hamstrings, and numbness and tingling when standing for more than 5 minutes. Plaintiff reported that his symptoms became progressively worse, though physical therapy gave him temporary relief. Dr. Naff noted that Plaintiff sat in the exam room in no apparent distress and moved his bilateral lower extremities with 5/5 strength. Dr. Naff also noted slightly positive nerve root tension on the left leg but normal sensation and reflexes. Plaintiff reported tenderness to palpation with a light touch. Though Plaintiff exhibited an antalgic (an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort) gait, he was able to stand without issues. Dr. Naff recommended a CT with myelogram. *Id*. Dr. Onabajo requested the recommended procedure for Plaintiff. *Id*. at 423-24.

On March 29, 2021, Dr. Onabajo requested a referral to the pain management panel. . Ex. A-1: PP. 426-27. On April 1, 2021, Dr. Onabajo requested a follow-up with Dr. Naff following the completion of Plaintiff's CT myelogram. Ex. A-1: PP. 434-35.

On April 14, 2021, the pain management panel saw Plaintiff, who reported no relief with Tylenol #3. Ex. A-1: PP. 440-41. The panel determined to optimize Plaintiff's Gabapentin dose and prescribe Oxycodone (a narcotic pain medication) for three weeks. *Id*. Dr. Onabajo requested Oxycodone, which Dr. Temesgen approved. *Id*. at 442-43.

On April 15, 2021, a CT myelogram was attempted on Plaintiff. Ex. A-1: PP. 924-26. During the procedure, Plaintiff experienced pain radiating down right lower extremity. Plaintiff was noted to thrash on the fluoroscopy table while a medical provider gently instilled contrast into the spinal canal, causing dislodgment of spinal needle. Attempts were made to place the

16

spinal needle on lower level, but Plaintiff continued to thrash. The procedure terminated due to Plaintiff's inability to withstand the procedure. *Id*.

Plaintiff received a CT of his thoracic spine which was unremarkable. Ex. A-1: PP. 922-23. Plaintiff received a CT of his lumbar spine which showed an apparent disc herniation at L4-5, a large disc bulge at L2-L3, and questionable thickening of the nerve roots in the lumbar spine. *Id*.

Upon his return from the hospital, Plaintiff was verbally responsive and ambulated with a steady gait. Ex. A-1: PP. 448-49.

On April 19, 2021, Plaintiff refused a neurosurgery follow-up. Ex. A-1: PP. 451, 824. NP Mijere also saw Plaintiff for complaints of mild to moderate back pain after his April 15, 2021 procedure. *Id*. at 452-53. Plaintiff denied bowel dysfunction, bladder dysfunction, numbness, and weakness. Upon examination, Plaintiff's spine was negative for posterior tenderness. NP Mijere determined to continue Plaintiff's current medications and advised Plaintiff to cease weight or heavy lifting, working, and yard activity. She also instructed Plaintiff to follow up within six days if his condition worsened or if he had no improvement. *Id*.

On April 20, 2021, Dr. Onabajo saw Plaintiff and informed him he as scheduled with Dr. Naff. Ex. A-1: PP. 456-57. Plaintiff stated that he wanted to hold off on further appointments until he talked to his lawyer. *Id*.

On May 6, 2021, Dr. Onabajo saw Plaintiff, who expressed no concerns. Ex. A-1: PP. 462-63. Dr. Onabajo requested Oxycodone for Plaintiff. Ex. A-1: PP. 460-61. Dr. Temesgen approved the request. *Id*.

On June 15, 2021, June 17, 2021, and June 21, 2021, nurses noted Plaintiff to have a steady gait. . Ex. A-1: PP. 1289-94.

On June 22, 2021, Plaintiff was transferred to another facility. Ex. A-1: P. 1295.

Following his transfer, a physician noted that Plaintiff made complaints of tremendous pain but outwardly did not seem to be in pain by observation. Ex. A-1: PP. 1328-30. The physician observed Plaintiff go from sitting on the bunk to standing rapidly with no limitations or signs of outward pain. Plaintiff was also seen standing for significant periods of time and on one occasion actually walked backwards very steadily and sat down on the bunk as asked. *Id*. He was later observed walking around his cell with a steady gait. *Id*. at 1330. Plaintiff's condition continues to be monitored by the medical staff. *See id*. at 1352.

The care and treatment Plaintiff received for his lumbar spine complaints was appropriate. Ex. B: ¶ 35. He has consistently been prescribed pain relievers, specialty off-site diagnostic testing, and specialist evaluations for his complaints of lumbar pain. However, Plaintiff has refused further evaluation by a neurosurgeon. Plaintiff has been prescribed pain medications at his current facility and will be monitored through the chronic care clinic. *Id*.

## II. LEGAL ARGUMENT

### A.    Motions to Dismiss

As to a 12(b)(6) motion to dismiss, a plaintiff fails to state a claim when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). This requirement "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

The Supreme Court has held that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted). However, the Fourth Circuit has "not read *Erickson* to undermine *Twombly's* requirement that a pleading contains more than labels and conclusions." *Giarratano v. Johnson*, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted) (applying *Twombly* standard in dismissing pro se complaint); *accord Atherton v. Dist. of Columbia Off. of Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009) ("A *pro se* complaint ... 'must be held to less stringent standards than formal pleadings drafted by lawyers.' But even a *pro se* complainant must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'") (quoting *Erickson*, 551 U.S. at 94 and *Iqbal*, 556 U.S. at 679).

## B.     Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate against a plaintiff who fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Failure to demonstrate a genuine issue for trial will result in summary judgment. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 951 (4th Cir. 1995).

19

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court may rely on only facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Id.* (citing *Ash v. United Parcel Serv.*, 800 F.2d 409, 411-12 (4th Cir. 1986)).

## C.     Deliberate Indifference Claims Under 42 U.S.C. § 1983

Federal claims by prisoners that they received constitutionally deficient medical care in violation of the Eighth Amendment are governed by the deliberate indifference standard. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* The "deliberate indifference" standard is made up of (1) an objective component requiring that the pain or condition be sufficiently serious; and (2) a subjective component requiring that the offending officials acted with a sufficiently culpable state of mind. *Id.* at 104-06. The objective component is satisfied by a serious medical condition and the subjective component is satisfied by showing deliberate indifference by prison officials. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). "[A] 'serious ... medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

"[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). It requires that a prison official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official is not deliberately indifferent if she did not actually draw the inference that the prisoner was exposed to a specific risk of harm. *Id.* at 844; *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Indeed, absent subjective knowledge, a prison official is not liable even "if the risk was obvious and a reasonable prison official would have noticed it." *Farmer*, 511 U.S. at 842.

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *accord Johnson*, 145 F.3d at 168. "Nor does a prisoner's disagreement with medical personnel over the course of his treatment make out a cause of action." *Taylor v. Bennett*, 105 F. Supp.2d 483, 487 (E.D. Va. 2000) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

Officials can only be held liable for their own conduct. *Iqbal*, 556 U.S. at 676-77; *see also Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014) ("[S]upervisors may not be held liable under 42 U.S.C. § 1983 for actions of subordinate employees unless the supervisors have 'direct culpability' in causing the plaintiff's injuries.") (citing *McWilliams v. Fairfax Cnty. Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996)), *abrogated on other grounds by Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *Foote v. Spiegel*, 118 F.3d 1416, 1423

(10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.").

### D.    First Amendment Retaliation

To state a colorable retaliation claim under Section 1983, a plaintiff "must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018). The "plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin*, 858 F.3d at 249. Moreover, the "plaintiff's actual response to the retaliatory conduct is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." *Id*. at 250. Finally, the plaintiff must plead sufficient facts to show that the allegedly retaliatory act "was taken in response to the exercise of a constitutionally protected right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

### E.    Medical Malpractice

"Medical malpractice claims must first be presented to the Maryland Health Claims Arbitration Board before a complaint may be filed in a court of law." *Miller v. Lehman*, No. JKB-14-0896, 2015 WL 641299, at *3 (D. Md. Feb. 12, 2015) (unpublished) (citing Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04 *et seq.* (2007)). A plaintiff is "required under Maryland law to bring his medical malpractice claim before the Health Claims Arbitration Board as a condition precedent to filing a malpractice or negligence suit." *Id.*; *see also Johnson v. Wexford Health Sources, Inc.*, No. JKB-14-2513, 2015 WL 3441958, at *3 (D. Md. May 26, 2015) (unpublished) ("Should plaintiff wish to seek damages based on medical malpractice, he is required under

22

Maryland law to bring his medical malpractice claim before HCADRO as a condition precedent to filing a malpractice or negligence suit.").

**F.      Plaintiff Failed to State a Claim Against Defendants**

First, to the extent Plaintiff alleges state law medical malpractice, there is no evidence that he complied with the mandatory prerequisites before filing suit. Specifically, Plaintiff was required to submit any medical malpractice claim to the Maryland Health Claims Arbitration Board before filing his complaint. Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01 *et seq.*; *Miller*, 2015 WL 641299 at *3. Plaintiff's medical malpractice claim must therefore be dismissed due to his failure to submit his claim to the Maryland Health Claims Arbitration Board.

Plaintiff claims that he believes that he has been subjected to retaliation, but fails to provide specific details regarding any purported retaliation. CM/ECF No. 1, P. 9; CM/ECF No. 6, PP. 1-3. Plaintiff's vague claims of retaliation are insufficient to state a First Amendment claim. Plaintiff fails to specify any purported First Amendment activity and fails to provide any factual basis for the causation element of his retaliation claim, which rests entirely on speculation of retaliation with no facts stated to connect any Defendant's actions with his constitutionally protected conduct. Plaintiff's allegations of retaliation are nothing more than "labels and conclusions" and "formulaic recitation[s] of the elements" of a retaliation claim absent of facts suggesting that Defendants' purported acts or omissions were "taken in response to the exercise of a constitutionally protected right." *Adams*, 40 F.3d at 75. Therefore, Plaintiff's retaliation claim is subject to dismissal.

Plaintiff is also unable to establish deliberate indifference against Defendants. As an initial matter, Plaintiff's claims related to the preparation instructions he received prior to a procedure is subject to dismissal because he has failed to allege that any Defendant provided him

with the purportedly incorrect instructions. CM/ECF No. 8; CM/ECF No. 12; CM/ECF No. 20. Plaintiff cannot hold Defendants liable for the acts or omissions of others. *Ashcroft*, 556 U.S. at 663 (noting that a government official may only be found liable for his own individual actions). In any event, Plaintiff's claims sound in negligence or medical malpractice, which cannot support a deliberate indifference claim. *Estelle*, 429 U.S. at 106.

Even to assume, *arguendo*, that Plaintiff has adequately pled an objectively serious medical need, he has failed to state a colorable claim for deliberate indifference against any Defendant. Plaintiff's vague allegation that he "sought help" from Ms. Battle is devoid of facts indicating that she was subjectively aware of a serious risk of harm to Plaintiff's health and ignored that risk. *Farmer*, 511 U.S. at 844. Similarly, though Plaintiff claims that he complained of pain to Dr. Sisay, NP Tchoumba, NP Ledjo, NP Mijere, and Dr. Onabajo, Plaintiff does not detail the substance of those complaints or these Defendants' alleged subjective knowledge regarding Plaintiff's condition. To the extent Plaintiff disagrees with these Defendants' course of treatment for Plaintiff's lumbar complaints, Plaintiff's mere disagreement with the treatment decisions of his medical providers also fails to state a claim for deliberate indifference. *Wright*, 766 F.2d at 849; *Taylor*, 105 F. Supp.2d at 487.

Plaintiff also disagrees with Dr. DeRosa and Dr. Temesgen's purported pain medication prescriptions. However, as noted above, such a disagreement fails to rise to the level of deliberate indifference. *Wright*, 766 F.2d at 849; *Taylor*, 105 F. Supp.2d at 487. And while Plaintiff alleges that Dr. DeRosa stated that his facility "didn't do pain management," Plaintiff simultaneously alleges that Dr. DeRosa prescribed two different pain medications for him. Plaintiff's allegations are internally inconsistent and, in any event, do not suggest that Dr. DeRosa ignored Plaintiff's complaints of pain.

To the extent Plaintiff alleges Defendants were negligent or committed medical malpractice, he fails to state a claim for deliberate indifference under § 1983. *See Estelle*, 429 U.S. at 106; *Johnson*, 145 F.3d at 168.

Plaintiff has failed to state a claim against Defendants, and his claims against them must be dismissed.

## G. Defendants are Entitled to Summary Judgment

Even to assume, arguendo, that Plaintiff stated a claim against Defendants sufficient to survive a 12(b)(6) motion, Defendants are still entitled to summary judgment. The declaration of Dr. Yonas Sisay, attached hereto as Exhibit A, and a true and correct copy of Plaintiff's relevant medical records, attached to Dr. Sisay's Declaration as Exhibit A-1, the declaration of Kimberly Battle, attached hereto as Exhibit B, and the declaration of Bolaji Onabajo, M.D., attached hereto as Exhibit C, demonstrate that Plaintiff received constitutionally adequate medical care.[2]

As noted above, Plaintiff fails to state a viable First Amendment retaliation claim against Defendants. Plaintiff's stark "belie[f]" that he has been subjected to retaliation, absent any factual allegations whatsoever, is insufficient to maintain a retaliation claim against Defendants. Plaintiff's baseless retaliation claim should thus be dismissed.

### A. Ms. Battle

As set forth above, Plaintiff's vague allegation that he "sought help" from Ms. Battle is insufficient to rise to the level of deliberate indifference. In any event, Ms. Battle was not involved in Plaintiff's medical treatment and was unable to dictate any aspect of Plaintiff's

---

[2] "In determining whether a prisoner has received adequate medical treatment, this Court is entitled to rely on the affidavits of medical personnel and prison medical records kept in the ordinary course of operation." *Bennett v. Reed*, 534 F. Supp. 83, 86 (E.D.N.C. 1981), *aff'd*, 676 F.2d 690 (4th Cir. 1982). When "it appears from the entire record that the prison medical authorities have made a sincere and reasonable effort to handle plaintiff's medical problems, plaintiff's constitutional rights have not been violated pursuant to 42 U.S.C. § 1983." *Id.* at 87.

course of treatment, including Plaintiff's prescription pain medications. Ex. B: ¶¶ 2, 5. At most, Ms. Battle investigated Plaintiff's informal complaint and attempted to address those complaints within the scope of her role an RN and ADON. Ex. B: ¶ 2. To the extent Plaintiff seeks to hold Ms. Battle liable for purported acts or omissions of his medical providers, he may not do so. *Ashcroft*, 556 U.S. at 663. Ultimately, Ms. Battle was unaware of any medical complaints that were not addressed by Plaintiff's medical providers. *Id.* ¶ 6. Indeed, Plaintiff's medical records indicate that Plaintiff's MCIJ providers saw him frequently for his complaints of chronic back pain and addressed those complaints accordingly. *See generally* Ex. A-1.

### B.  NP Tchoumba

NP Tchoumba appropriately addressed Plaintiff's complaints of musculoskeletal complaints. As an initial matter, when NP Tchoumba saw Plaintiff on October 24, 2019, November 6, 2019, November 18, 2019, December 26, 2019, and February 10, 2020, Plaintiff made no complaints of lumbar pain. Ex. A-1: PP. 203-08, 221-22, 238-39. Additionally, during this period, Plaintiff was seen by Dr. Sisay for his chronic lower back pain. *Id*. at 229-31. On February 20, 2020, Plaintiff complained of pain in his left hip and calves and NP Tchoumba noted his history of back pain and Plaintiff's reports that Baclofen, Indomethacin, and Elavil were ineffective. NP Tchoumba examined Plaintiff and observed no redness, swelling, or deformity, though she noted a mild limp. Based on Plaintiff's report that Indomethacin was ineffective, she discontinued that medication and prescribed Mobic, an alternate NSAID, ordered an x-ray of Plaintiff's left hip, encouraged Plaintiff to perform routine stretching exercises, and ordered a referral to a provider for follow-up when Plaintiff's x-ray results were available. *Id*. The record thus demonstrates that NP Tchoumba thoroughly addressed Plaintiff's complaints of musculoskeletal pain. NP Tchoumba switched Plaintiff's NSAID based on his report that

Indomethacin was ineffective, encouraged stretching exercises, and ordered diagnostic testing and a follow-up appointment with a provider. Plaintiff's objective medical records do not plausibly suggest that NP Tchoumba "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety." *Farmer*, 511 U.S. at 837.  Accordingly, Plaintiff's claims against NP Tchoumba should be dismissed.

      *C.  NP Ledjo*

      Similarly, NP Ledjo provided thorough treatment to Plaintiff. On March 26, 2020, when Plaintiff reported that his hip, knee, and back pain were not well-controlled, NP Ledjo discontinued his Elavil prescription and prescribed Cymbalta, an alternate pain medication. Ex. A-1: PP. 252-53. On April 23, 2020, Plaintiff reported improvement with Cymbalta. *Id*. at 255-56. When Plaintiff complained of hip pain on July 11, 2020, NP Ledjo examined Plaintiff, noting no significant abnormalities, and prescribed glucosamine chondroitin and issued an accommodation for a bottom bunk. *Id*. at 262-63. On September 24, 2020, when Plaintiff requested an increase of pain medications, NP Ledjo examined Plaintiff, noting that he was in no apparent distress, exhibited normal musculature with no skeletal tenderness or joint deformity, and determined in an exercise of her medical judgment that an increase of Plaintiff's pain medications were not medically indicated. *Id*. at 276-77. When Plaintiff again requested an increase in pain medications on September 14, 2020, NP Ledjo noted she would request a copy of his CT scan and review it in anticipation of a potential consultation with the pain management panel. *Id*. at 278-79. NP Ledjo reviewed the CT scan on October 5, 2020, and requested a consultation with the pain management panel. *Id*. at 282-85. On October 6, 2020, NP Ledjo prescribed Tylenol for Plaintiff, which the pain management panel ultimately recommended as well one day later. *Id*. at 286-89. In the course of her treatment of Plaintiff, NP Ledjo prescribed

medications for Plaintiff's complaints of pain, including Tylenol, Cymbalta, and glucosamine chondroitin, issued an accommodation for a bottom bunk, and facilitated a consultation with the pain management panel. NP Ledjo's treatment of Plaintiff's complaints are the opposite of deliberate indifference.

### D.  Dr. Sisay

Dr. Sisay's treatment of Plaintiff's chronic lumbar spine complaints was based on his examinations of Plaintiff, his review of Plaintiff's diagnostic imaging results, Plaintiff's subjective complaints, and his objective clinical condition. *See* Ex. A. On February 5, 2019, Plaintiff reported to Dr. Sisay that his pain was controlled with his current medications and physical therapy had helped him. Ex. A-1: PP. 154-56. Dr. Sisay thus continued Plaintiff's pain medications. *Id*. When Dr. Sisay next saw Plaintiff on October 1, 2019, Plaintiff reported that his pain was markedly controlled after physical therapy; Dr. Sisay again renewed Plaintiff's medications. *Id*. at 197-99. Plaintiff again reported that his pain was controlled on January 8, 2020; Dr. Sisay renewed Plaintiff's medication accordingly. *Id*. at 229-31. Dr. Sisay also requested Biofreeze for Plaintiff on March 9, 2020. *Id*. at 247-48. When Plaintiff reported that his pain was not fully controlled on March 19, 2020, Dr. Sisay examined him and doubled his Mobic prescription based on that examination. *Id*. at 249-51. On May 28, 2020, Plaintiff reported that his medications were helping and his hip pain was stable; Dr. Sisay thus renewed Plaintiff's medications. *Id*. at 259-60. Plaintiff again reported that his medications were helping on July 29, 2020, and Dr. Sisay renewed Plaintiff's medications accordingly. *Id*. at 267-69.

As demonstrated by the medical records, Dr. Sisay did not ignore a risk of harm to Plaintiff of which he was aware. When Plaintiff complained of uncontrolled pain, Dr. Sisay adjusted Plaintiff's medications in accordance with his medical judgment. To the extent Plaintiff

complains that Dr. Sisay did not prescribe opioid pain medications for Plaintiff, Dr. Sisay did not believe opioid medications were medically necessary in light of Plaintiff's objective condition and the danger of dependence and abuse associated with those medications. Ex. A: ¶¶ 9-13.

### E. Dr. DeRosa

Plaintiff claims that Dr. DeRosa prescribed Gabapentin for Plaintiff despite his reports that the medication didn't work for him and that Dr. DeRosa informed him that "CMCF didn't do pain management." CM/ECF No. 1, P. 7.

Plaintiff's medical records demonstrate that, when Dr. DeRosa first saw Plaintiff on October 21, 2020, he increased Plaintiff's Baclofen and acetaminophen prescriptions, continued Plaintiff's prescriptions for glucosamine chondroitin, Cymbalta, and Mobic, and ordered a follow-up appointment in three weeks to address Plaintiff's complaints of pain. Ex. A-1: PP. 293-95. On November 18, 2020, the pain management panel, in consultation with Plaintiff and Dr. DeRosa, formulated a treatment plan which included prescription of Neurontin and Elavil with potential consideration for Lyrica and Tramadol, and transferring Plaintiff to a facility where he could be prescribed controlled substances. *Id.* at 302-03. Plaintiff was transferred that day. *Id.* at 308-09. So although Dr. DeRosa was unable to prescribe controlled substances at CMCF, he facilitated Plaintiff's transfer to a facility where Plaintiff could be prescribed those medications. Dr. DeRosa also did not ignore Plaintiff's complaints of pain but instead exercised his medical judgment and consulted with other physicians in order to determine the best course of treatment for Plaintiff.

### F. Dr. Temesgen

Dr. Temesgen was a member of the pain management panel and rendered thoughtful treatment in response to Plaintiff's complaints of pain. On November 18, 2020, Dr. Temesgen

coordinated with other providers to determine a pain medication regimen consisting of Neurontin and Elavil with potential consideration for Lyrica and Tramadol for Plaintiff and facilitated Plaintiff's transfer to a facility where Plaintiff could be prescribed controlled substances. Ex. A-1: PP. 302-03. Plaintiff was transferred that same day. *Id.* at 308. On February 17, 2021, when Plaintiff stated that his prescribed medications were ineffective for his complaints of lumbar pain, Dr. Temesgen recommended Tylenol #3, a narcotic pain medication. *Id.* at 398-99. After Plaintiff reported that Tylenol #3 was ineffective, the pain management panel recommended Oxycodone, which Dr. Temesgen approved. *Id.* at 440-43. Dr. Temesgen again approved Oxycodone on May 6, 2021. *Id.* at 460-61. Dr. Temesgen carefully considered Plaintiff's subjective complaints, including his statements regarding his medication preferences, and Plaintiff's objective condition in determining the best course of care for Plaintiff. Plaintiff's disagreement with the medical judgment of Dr. Temesgen does not constitute an Eighth Amendment violation. *Wright*, 766 F.2d at 849; *Taylor*, 105 F. Supp.2d at 487.

### *G. NP Mijere*

NP Mijere properly addressed Plaintiff's complaints of pain within the scope of her practice. On December 8, 2020, NP Mijere saw Plaintiff upon his discharge from quarantine and noted she would refer him to the chronic care clinic for treatment of his pain complaints. Ex. A-1: PP. 254-55. She referred him on December 14, 2020, and Plaintiff was seen on December 21, 2020. *Id.* at 356-59, 362-64. On January 5, 2021, when Plaintiff complained of ongoing chronic back pain, NP Mijere noted that Plaintiff was awaiting to be seen by the pain management panel but prescribed muscle rub (which Plaintiff later refused). *Id.* at 376-77, 384. On January 12, 2021, NP Mijere refilled Mobic at Plaintiff's request. *Id.* at 393-94. On February 2, 2021, Plaintiff reported to NP Mijere that his pain medication was not working. *Id.* at 385-386.

Because Plaintiff was taking numerous pain medications beyond the scope of her practice, NP Mijere referred Plaintiff to the chronic care clinic for further evaluation, and Dr. Onabajo evaluated Plaintiff just two days later. *Id*. at 395-96.

Contrary to Plaintiff's allegations, NP Mijere did not disregard Plaintiff's complaints of pain at any time. Rather, as set forth in the medical records, certain of the pain medications prescribed to Plaintiff were beyond NP Mijere's scope of practice; therefore, she referred Plaintiff to a higher-level provider – a medical doctor – to address Plaintiff's complaints pertaining to his medications. Ex. A-1: PP. 385-86.

Though Plaintiff alleges that NP Mijere disregarded his other medical complaints, his medical records do not support these allegations. For example, on December 8, 2020, NP Mijere refilled Plaintiff's medications and requested an optometry consultation for Plaintiff. Ex. A-1: PP. 354-55. On December 16, 2020, NP Mijere prescribed medications for Plaintiff's BPH, scalp rash, and GERD. *Id*. On December 28, 2020, NP Mijere prescribed Nasacort as requested by Plaintiff. *Id*. at 370-71. On March 11, 20201, NP Mijere renewed Plaintiff's BPH medication. *Id*. at 416-17. On March 19, 2021, NP Mijere prescribed X-Seb T Plus for Plaintiff's scalp rash and advised Plaintiff to use cocoa butter for his complaints of bumps on his hands. *Id*. at 418-19. At no time did NP Mijere ignore or disregard Plaintiff's medical complaints. Therefore, summary judgment should be granted in her favor.

### H. Dr. Onabajo

Dr. Onabajo also rendered conscientious treatment to Plaintiff for his complaints of chronic lumbar pain. When Dr. Onabajo first saw Plaintiff on December 21, 2020, he ordered Tramadol for Plaintiff to be adjusted until Plaintiff's pain was controlled. Ex. A-1: PP. 365-69. As Dr. Onabajo explained, it is appropriate to start opioid medications at lower doses and adjust

as necessary due to the risks associated with these medications. Ex. B: ¶ 12. Dr. Onabajo also requested a neurosurgical consultation for Plaintiff. Ex. A-1: PP. 362-64. When Plaintiff reported that Tramadol was not working for him on December 31, 2020, Dr. Onabajo increased the dosage. *Id*. at 374-75. On February 4, 2021, Dr. Onabajo referred Plaintiff to the pain management panel when he reported that Tramadol did not work. *Id*. at 389-90. The pain management panel held a consultation with Plaintiff on February 17, 2021, and Dr. Temesgen recommended Tylenol #3. *Id*. at 398-99. On February 22, 2021, Dr. Onabajo requested a CT scan of Plaintiff's lumbar spine. *Id*. at 402-03. Following Plaintiff's consultation with a neurosurgeon, Dr. Onabajo requested a CT myelogram of Plaintiff's thoracic and lumbar spine. *Id*. at 423-24. Dr. Onabajo requested referral to the pain management panel again on March 29, 2021, and requested a follow-up appointment with Plaintiff's neurosurgeon on April 1, 2021. *Id*. at 426-27, 434-35. The pain management panel held a consultation on April 14, 2021, and recommended Oxycodone, which Dr. Onabajo prescribed. *Id*. at 440-43. Plaintiff later refused the neurosurgery follow-up and stated to Dr. Onabajo that he wanted to hold off on further appointments until he spoke with his lawyer. *Id*. at 451, 456-57, 824. During his treatment of Plaintiff, Dr. Onabajo prescribed numerous pain medications, facilitated pain management panel consultations, a neurosurgery consultation, and diagnostic testing. Dr. Onabajo did not ignore Plaintiff's complaints at any time but instead consulted with multiple providers to ensure that those complaints were addressed. It was Plaintiff who refused the care offered to him.

Plaintiff's allegation that Dr. Onabajo failed to properly treat his other medical conditions is contradicted by his medical records, For example, Dr. Onabajo saw Plaintiff for complaints of difficulty urinating and requested an evaluation by a urologist. Ex. A-1: PP. 409-12. Dr. Onabajo

also saw Plaintiff for an infected great toenail and referred him to another provider for additional consultation for those complaints. *Id*. at 432-33, 445-46.

In the face of the multitude of care rendered by Defendants, Plaintiff cannot demonstrate that any defendant "disregarded a substantial risk of serious injury" to Plaintiff. *Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001). While Plaintiff may have preferred other pain medications than those he was prescribed, that disagreement does not amount to deliberate indifference, particularly in light of the well-known risks associated with use of opioid medications for treatment of chronic musculoskeletal pain. *Wright*, 766 F.2d at 849; *Taylor*, 105 F. Supp.2d at 487. As set forth above, Plaintiff's providers took prudent and reasonable steps to balance treatment of Plaintiff's subjective complaints of pain with their objective examinations and their medical knowledge. These providers rendered a carefully considered course of treatment in response to Plaintiff's complaints of chronic lumbar pain which included regular evaluations, multiple pain medications, accommodations, diagnostic testing, physical therapy, and orthopedic and neurosurgery assessments. Accordingly, the Court should grant Defendants' motion for summary judgment and dismiss Plaintiff's claims with prejudice.

## H.   Plaintiff's Request for Injunctive Relief Should be Denied

"The grant of a preliminary injunction is an 'extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 538 (D. Md. 2014) (quoting *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011)). "Thus, the burden placed upon Plaintiffs to state a claim for a preliminary injunction is high." *EndoSurg Med.*, 71 F. Supp. 3d at 538. Both the Fourth Circuit and the Supreme Court have detailed the four requirements that plaintiff must show to be granted a preliminary injunction:

> (1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest.

*Id.* (quoting *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010)). "All four requirements must be met in order for a preliminary injunction to be granted." *Id.* (citing *Dewhurst*, 649 F.3d at 290).

Plaintiff has not satisfied any of the four criteria to show he is entitled to injunctive relief, and this Court should deny his request for injunctive relief. As demonstrated above, Defendants did not violate Plaintiff's First or Eighth Amendment rights or any other rights. Therefore, Plaintiff is unlikely to succeed on the merits. Plaintiff also has not demonstrated that he will suffer irreparable harm absent his unspecified injunctive relief. Plaintiff has received and continues to receive extensive medical treatment for his medical conditions. *See generally* Ex. A-1. Plaintiff's medical condition is evaluated on an ongoing basis and the record shows that his medical providers have provided treatment in accordance with their medical judgment and Plaintiff's objective clinical condition. *Id*. The record further shows that Plaintiff has refused care offered by his providers. Specifically, Plaintiff refused further neurosurgical evaluation for his complaints of pain and instead seeks to consult his attorney, not a medical provider, regarding the course of his treatment. Finally, the balance of equities does not weigh in Plaintiff's favor, and an injunction is not in the public interest. Absent the most extraordinary circumstances, a federal court should not issue an injunction concerning prison management, including medical care. It is not in the public interest to allow Plaintiff to dictate his course of treatment over the careful monitoring of trained medical staff who are familiar with Plaintiff's medical history.

## III.  CONCLUSION

Defendants respectfully request that Plaintiff's suit against them be dismissed for failure to state a claim or, since no dispute of material fact exists, that summary judgment be entered in their favor.

Respectfully submitted, this 10th day of September 2021.

> **MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C.**
>
> By: */S/ Megan T. Mantzavinos*
> Megan T. Mantzavinos (Bar No.: 16416)
> mmantzavinos@moodklaw.com
> Sarah Boehme (Bar No.: 22334)
> sboehme@moodklaw.com
> 600 Baltimore Avenue, #305
> Towson, Maryland  21204
> (410) 339-6880
> (410) 339-6881 (Fax)
> *Attorney for Kimberly Battle, Yonas Sisay,*
> *M.D., Chantal Tchoumba, NP, Yvette Ledjo,*
> *NP, Liberatus DeRosa, M.D., Kasahun*
> *Temesgen, M.D., Janet Mijere, NP and Bolaji*
> *Onabajo, M.D.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of September 2021, a copy of the foregoing

document was electronically transmitted to this court and mailed first class, postage pre-paid to:

Julius Dontario Beckles
#1202402, 466-027
2020 Toulson Road
Jessup, MD 20794
*Pro Se Plaintiff*

Stephanie Judith Lane Weber
State of Maryland
Office of the Attorney General
200 Saint Paul Pl
Baltimore, MD 21202
Email:  slaneweber@oag.state.md.us
*Interested Party*
*Via CM/ECF*

Douglas Conrad Meister
Gina Marie Smith
Meyers Rodbell and Rosenbaum PA
6801 Kenilworth Avenue, Suite 400
Riverdale, MD 20737-1385
Email:  dmeister@mrrlaw.net;
gsmith@mrrlaw.net
*Co-Counsel for Defendant Yonas Sisay, M.D.*
*Via CM/ECF*

_____*/s/ Megan T. Mantzavinos*_____
Patricia Beall