**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JULIUS DONTARIO BECKLES,** | * | |
| **Plaintiff,** | * | |
| v. | * | **Case No. GJH-21-234** |
| **KIMBERLY BATTLE,** *et al.,* | * | |
| **Defendants.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>MEMORANDUM OPINION</u>**

Plaintiff Julius Dontario Beckles, a prisoner confined at Eastern Correctional Institution ("ECI"), brings this civil rights action against Defendants Kimberly Battle, Yonas Sisay, M.D., Chantal Tchoumba, NP, Yvette Ledjo, NP, Liberatus DeRosa, M.D., Kasahun Temesgen, M.D., Janet Mijere, NP, Bolaji Onabajo, M.D., Dr. Musa, and Corizon Health Inc. ECF No. 1. Beckles claims Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment. ECF No. 1. Pending before the Court are Defendants Kimberly Battle, Yonas Sisay, M.D., Chantal Tchoumba, NP, Yvette Ledjo, NP, Liberatus DeRosa, M.D., Kasahun Temesgen, M.D., Janet Mijere, NP, and Bolaji Onabajo, M.D's (the Corizon Defendants) Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 42, and Defendants Kimberly Battle, Yonas Sisay, M.D., Chantal Tchoumba, NP, Yvette Ledjo, NP, Liberatus DeRosa, M.D., Kasahun Temesgen, M.D., Janet Mijere, NP, Bolaji Onabajo, M.D and Dr. Musa's (the Wexford Defendants) Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 43. Beckles has responded (ECF No. 49) and Corizon Defendants have replied. ECF No. 50. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the

following reasons, Defendants' motions to dismiss or, in the alternative, for summary judgment are granted.

## I.    BACKGROUND

### A.    Plaintiff's Allegations

In his unverified Complaint, Beckles states that upon his incarceration in February of 2018 he began to seek help for injuries he sustained before his incarceration, filing a number of sick call slips and administrative remedy requests regarding the ineffectiveness of medication to treat his complaints of lower body pain, numbness, and falling.  ECF No. 1 at 6.[1]  At that time he was incarcerated at Maryland Correctional Institution-Jessup (MCIJ) and alleges that his medical providers at that facility failed to properly treat his previously diagnosed back problems. *Id*.; *see also* ECF Nos. 1-1, 1-2 (diagnostic and pain management records generated prior to Plaintiff's incarceration).

Subsequently, he was transferred to Central Maryland Correctional Facility (CMCF) where he alleges he also did not receive proper pain management. *Id.* Eventually he was evaluated by Drs. Temesgen and DeRosa at CMCF. *Id* at 7. They placed him on Gabapentin (Neurontin), despite his advising them that the medication did not work. *Id.*  Medical providers also recommended he try Tramadol, but Plaintiff advised the providers that Tramadol was also ineffective. *Id*. Nevertheless, he was placed on Tramadol and Dr. DeRosa advised him that CMCF did not "do pain management" and he would need to be transferred.  *Id*.

Thereafter, on November 18, 2020, Plaintiff was transferred to Dorsey Run Correctional Facility (DRCF).  *Id*. at 8. Dr. Onabojo advised Plaintiff that he would talk to someone about

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/EC) refer to the page numbers generated by that system.

Plaintiff's complaints. *Id*. Plaintiff was seen by Dr. Onabajo three times with no positive result. He also saw Nurse Practitioner (NP) Mijere but his complaints of pain were not addressed. *Id*.

Additionally, Plaintiff claims that "retaliation has been taken place" but does not specify what that retaliation was, who retaliated against him, or why he was being retaliated against. ECF No. 1 at 9.

Plaintiff seeks compensatory damages and "medical care and medication adequate for his injuries." ECF No. 1 at 5.

After filing his initial complaint, Plaintiff filed a number of "supplements" amplifying his allegations.  Plaintiff states that Dr. Onabajo and NP Mijere also refused to address his "other medical needs."[2]  ECF No. 6 at 2.  He does not address the nature of these other needs. *Id*. He again states, without support, that his efforts to resolve the medical issues "have been met with retaliation." *Id*. at 3.

In other "supplements" Plaintiff claims medical staff provided him incorrect instructions prior to his myelogram with contrast and as a result he suffered pain during the procedure. ECF No. 8 at 1; ECF No. 12; ECF No. 20. Specifically, he claims Nurse Ola advised him not to eat or drink anything after midnight the day before the procedure. When he arrived for his procedure the doctor advised that Plaintiff would be given an injection that would feel like a bee sting for a couple of seconds and then resolve. ECF No. 8 at 1. However, Plaintiff reports that he felt like someone was trying to pull his spine out of his back and he could not move his lower body. Eventually the nurse asked him if he was "highly hydrated" and he responded that he was not

---

[2] Plaintiff's complaints regarding the Administrative Remedy Procedure (ARP) process, alleged interference with mail, and loss of his property, are not properly before the Court. ECF No. 6 at 1-2.  Additionally, the facts alleged in his Declarations (ECF Nos. 39 and 49) regarding his parole eligibility, case management decisions, property, and medical care while housed at Eastern Correctional Institution (ECI) are not properly before the Court and will not be considered in the context of this case. If Plaintiff believes his rights have been violated based on the conduct alleged in these filings, Plaintiff may file a new civil rights complaint naming proper parties and articulating those claims.

because the nurse at DRCF had advised him not to eat or drink anything after midnight. *Id*.  The nurse stated that was not the instructions the hospital had given the facility and he was supposed to be well hydrated for the procedure and the lack of hydration was causing his adverse reaction to the procedure.  *Id*. at 2.  Plaintiff alleges that as a result of the difficulty with the myelogram he was paralyzed for five hours, admitted to the hospital emergency room, and suffered additional problems with his back. ECF No. 20.

>    **B.     Defendants' Responses**

Defendants state that Plaintiff is a 49 year-old male with a medical history of hypertension, benign prostatic hyperplasia (BPH), chronic back pain, and polysubstance abuse including daily use of heroin, cocaine, and alcohol prior to his incarceration. ECF No. 42-5 at 3.

On February 23, 2018, Plaintiff was diagnosed as having polysubstance abuse and was treated for withdrawal symptoms.  ECF No. 42-5 at 4, 26.

On March 1, 2018, Plaintiff submitted a sick call slip complaining of back pain and withdrawal from oxycodone.  ECF No. 43-4 at 25.  He was seen that day by Dr. Bedford. *Id*. at 26-28.  Plaintiff reported he had a herniated disc and was on pain management prior to his incarceration. He asked to see the methadone physician. *Id*.  He was continued on Naproxen and prescribed Robaxin, a muscle relaxer, and advised that his place of incarceration did not treat chronic pain with Methadone. *Id*.

Plaintiff submitted a sick call slip on April 2, 2018, complaining of back pain. ECF No. 43-4 at 42. He was seen at sick call on April 4, but reported that the issue had resolved. *Id*.

Plaintiff submitted another sick call on April 12 complaining of back pain. ECF No. 43-4 at 49. On April 19, he submitted a sick call slip seeking renewal of his Baclofen and was referred to a provider.  *Id*. at 52-55.  The Baclofen renewal was denied on April 24 because Plaintiff was already on the muscle relaxer Robaxin. *Id*. at 63-64.

On May 4, 2018, Plaintiff was seen by Dr. Wabu in the chronic care clinic. ECF No. 43-3 at 77-78.  He reported back pain as a dull ache in the morning. *Id*.  Plaintiff's back pain was assessed as stable and good condition; his dosage of Amitriptyline, a medicine used to treat depression and nerve and back pain, was increased. *Id*.  His prescriptions for Robaxin and Meloxicam were discontinued and Baclofen restarted. *Id*.

On May 17, 2018, Plaintiff advised Dr. Wubu that his morning back pain was not helped by his medication. ECF No. 43-4 at 83-86. Dr. Wubu ordered Plaintiff's Baclofen and Amitriptyline increased. *Id*.  Dr. Wubu advised Plaintiff that the pain management records requested regarding Plaintiff's pre-incarceration care were received but they were for the wrong patient. *Id.* Plaintiff signed another release of information. *Id*. at 87.

Pharmacist Sise consulted with Plaintiff regarding his pain management plan on May 22, 2018.  ECF No. 43-4 at 88-89.  His current medications were reviewed. Sise also noted that the Center for Disease Control (CDC) recommended first using non-opioid and nonpharmacological therapies for pain management. *Id*.  Additionally, the CDC advised that opioid medications were not intended for long-term use for non-malignant diseases due to their tendency to create tolerance and physical dependence.  *Id*. As such, it was recommended that in addition to Plaintiff's already prescribed medication, he receive Tylenol 500 mg three times a day for break through pain. *Id*.

On May 24, 2018, Plaintiff advised Dr. Oni that he was doing well on his medications. ECF No. 43-4 at 93-99. He reported, however, that he had a gunshot wound to his back and was not getting adequate treatment.  *Id*.  On May 29, 2018, Plaintiff submitted a sick call slip complaining of back pain. *Id*. at 100.  He was seen the following day and given Naproxen 600

mg twice daily for three days. *Id*. at 101. He was advised to submit another sick call slip if the pain continued. *Id*.

Plaintiff submitted a sick call slip on June 9, 2018, complaining that the pain medication was not working. ECF No. 43-4 at 102. He was seen on June 12 at nurse sick call and reported pain of 8 on a 10-point scale.  He wanted an injection in his back with strong medication. *Id*. at 105.  He was referred to a provider. *Id*.

Dr. Abiodun examined Plaintiff on June 12, 2018, regarding Plaintiff's complaints of back pain. ECF No. 43-4 at 106-112.  Plaintiff again reported his pain as 8 on a 10-point scale. He did not appear in distress and had no abnormality of the back or posterior tenderness. *Id*. He had normal flexion and extension.  His prescription for Amitriptyline was increased and he was also prescribed Meloxicam, a lidocaine patch, a back brace, and physical therapy. *Id*. The following day Plaintiff was seen at nurse sick call for complaints of back pain which he reported had resolved. *Id*. at 113-15. The request for physical therapy was approved on June 18, 2018. *Id*. at 117.

On June 22, 2018, Plaintiff was seen at nurse sick call following a fall. ECF No. 43-4 at 120. He reported pain as 5 on a 10-point scale and was assessed as walking without discomfort or distress. *Id*. He was also seen by Dr. Wubu that day for follow up. *Id*. at 121-23.  Plaintiff advised that he fell because he was standing too long in court and reported that the morning pain bothered him. *Id*.  He did not appear in any distress but walked with a limp.  His lidocaine patch was increased to twice daily and the prescription for Meloxicam was changed to an evening dose. *Id*.

Plaintiff was provided a back brace on June 26, 2018. ECF No. 43-4 at 127-28.  On July 6, 2018, he was given an order for a bottom bunk. *Id*. at 132.

On July 10, 2018, Plaintiff submitted another sick call slip complaining of back pain. ECF No. 43-4 at 138. He was evaluated by Dr. Akal on July 13, 2018, who assessed Plaintiff's back pain as stable and renewed the lidocaine patches. *Id*. at 141-42. That same day, custody staff failed to bring Plaintiff to physical therapy. *Id*. at 143. Custody staff again failed to bring Plaintiff for physical therapy on July 20 and 27 and August 2 and 10, 2018. *Id*. at 159, 160, 161, 163.

On August 10, 2018, Plaintiff was transferred to Patuxent Institution. ECF No. 43-4 at 164.

On August 20, 2018, Plaintiff's prescription of Amitriptyline was renewed. ECF No. 43-4 at 166. A week later he was seen by Dr. Moultrie at the chronic care clinic. *Id*. at 169-71. His back ache was assessed as a chronic condition and his prescription for Baclofen was renewed. *Id*. It was noted that Plaintiff had been approved for physical therapy but had yet to go. *Id*. Shortly thereafter, the medical director approved Plaintiff's lidocaine patch. ECF No. 43-4 at 176-77.

Sometime between September 17 and 20, 2018, Plaintiff was transferred to MCIJ.  ECF No. 43-4 at 183-84.  On September 24, 2018, after recently being transferred MCIJ, Plaintiff was evaluated by NP Rotimi, and he reported chronic back pain not resolved by his prescribed medications. *Id.* at 186-87. He was referred for pain management and his medical records requested. *Id*.

Around the first of October, he was again seen by NP Rotimi. ECF No. 42-5 at 93. Plaintiff requested a steroid shot of his lumbar spine, which Rotimi requested. *Id*. at 93-95. Two weeks later, when the location of the injection was to be clarified, Plaintiff refused the injection, advising that he had injections before and "that **** don't work." *Id*. at 105.

Dr. Sisay, a medical doctor who treated Plaintiff at MCIJ (ECF No. 42-4 at 1, ¶ 2), first examined Plaintiff on October 18, 2018.  ECF No. 42-5 at 107-09.  At that time, Plaintiff reported a herniated disk that pushed on an existing nerve root and spinal stenosis. Dr. Sisay reviewed the CT of the spine done at JAI medical, before Plaintiff's incarceration in January of 2017, which showed concentric spinal stenosis at L2, L3, and L3-L4 as well as lateral disc herniation at L4-L5, encroaching on the nerve root. *Id*. at 107. It was noted that Plaintiff had recently refused the steroid injection. *Id*. During examination, Plaintiff did not appear to be in distress and showed no significant lumbar spine physical findings.  *Id.* at 108. As a result, Dr. Sisay prescribed Indocin (Indomethacin), a non-steroidal anti-inflammatory (NSAID) and discontinued a different NSAID Mobic (Meloxicam). He also advised Plaintiff to do exercises for low back pain and renewed Plaintiff's prescriptions of Baclofen, a muscle relaxer, and a Lidocaine patch. *Id*. at 107, 108, 110.  Plaintiff had an active prescription for Amitriptyline, an anti-depressant used to treat depression and mood disorders as well as other conditions such as nerve and back pain. *Id*. at 108; ECF No. 42-4 at 4, ¶ 8.  Dr. Sisay also wrote an order that Plaintiff be provided a bottom bunk. ECF No. 42-5 at 107.

Dr. Sisay avers that as a result of his examination of Plaintiff at this appointment he did not prescribe opioid pain medication because he did not believe that an opioid was medically indicated. ECF No. 42-4 at 4, ¶ 9. Dr. Sisay explains that opioids and opioid-like medications may be effective at alleviating pain, but their widespread use has caused significant public health problems, complicating their utility. *Id*. He also avers that prescription opioid use can lead to substance abuse. *Id*.  He further explains that opioids can cause significant adverse side effects including psychological and physical addiction, particularly for patients like Plaintiff who have a

history of addiction. *Id*. at 5, ¶ 10.  Additionally, long-term use of opioids leads to tolerance, dependence, and addiction. *Id*.

Dr. Sisay explains that in 2016, in response to the national opioid epidemic, the CDC developed guidelines for prescribing opioids to treat chronic pain and to improve care and reduce the risk of opioid abuse and overdose. ECF No. 42-4 at 5, ¶ 11.  Those guidelines recommend non-opioid therapy for chronic pain, outside of active cancer, palliative care, or end of life care. *Id.* The CDC also advises health care providers to consider managing pain without the use of opioids including exercise, physical therapy, and the use of non-opioid analgesics. *Id*. Additionally, Dr. Sisay explains that "in 2018, the Journal of American  Medical Association published an investigation which showed that treatment with opioids was not superior to treatment with non-opioid medications for improving pain-related function." *Id*.  Accordingly, the use of opioid therapy for moderate to severe chronic back, hip or knee osteoarthritic pain was not recommended. *Id*.  The prevailing CDC recommendation regarding pain management is not focused on eliminating pain altogether but rather on reducing pain intensity and prioritizing pain related functional improvement or minimizing risk of opioid related harms. *Id*., ¶ 12. Further, the correctional setting complicates the use of opioids given that the use of opioids is contraband and can be used in suicide attempts or may increase the risk of patients becoming targets of violence or manipulation in order to gain access to their opioid medication.  *Id*. at 6,  ¶ 14.  Lastly, Dr. Sisay avers that at MCIJ, when medically indicated, medical providers, along with the patient, consult with a pain management panel and clinical pharmacist but opioids are a last resort for use in chronic pain management. *Id*.

In light of Plaintiff's chronic back pain, prevailing treatment guidelines, risk of long-term use of opioid medications, and Plaintiff's history of drug abuse, Dr. Sisay avers that he did not

believe opioid medication was appropriate to treat Plaintiff. ECF No. 42-4 at 6, ¶ 13. Dr. Sisay avers that he believed non-opioid pain medications were the appropriate course of treatment for Plaintiff's complaints of chronic lumbar pain, particularly in light of physical assessments and the lack of impairment to Plaintiff's activities of daily living. *Id.*

Dr. Lawrence Manning evaluated Plaintiff on November 27, 2018, due to Plaintiff's continued complaint of lower back pain with radiating pain to extremities. ECF No. 42-4 at 6, ¶ 15; ECF No. 42-5 at 120.  Dr. Manning observed Plaintiff in no acute distress with a normal gait and erect posture. Plaintiff had intact sensation in his legs and a normal heel/toe walk. Examination revealed right lumbar paravertebral tenderness and a positive straight leg raise at 70 degrees bilaterally-which can be indicative of nerve root irritation in the lumbar spine. *Id.* Dr. Manning referred Plaintiff to a consultation with as spinal surgeon and recommended a CT scan of the lumbar spine. *Id.* He did not recommend or prescribe a narcotic analgesic. *Id.*

Plaintiff was evaluated by Dr. Ashok Krishnaswamy, an orthopedic surgeon, on December 12, 2018. ECF No. 42-4 at 125.  Dr. Krishnaswamy recommended Plaintiff continue taking Motrin, attend physical therapy, and undergo a CT scan with contrast. *Id.* He also recommended that after completion of the diagnostic testing Plaintiff be referred for a neurosurgical consult. *Id.* He did not recommend or prescribe narcotic pain medication. *Id.*

Plaintiff requested feed-in accommodation for meals to be sent to his cell. ECF No. 42-4 at 132.  He was again evaluated by a provider who observed Plaintiff walked with a steady gait and did not show any limb weakness. Plaintiff reported numbness and pain in his feet. The provider advised Plaintiff to move around and that he would not benefit from a prolonged feed-in accommodation. As such, he was given feed-in for two days.  He was offered Ibuprofen and Capsaicin-a topical pain medication; Plaintiff declined both.  *Id.*

Plaintiff had a physical therapy consultation on January 8, 2019. ECF No. 42-4 at 141-42. At that time he reported no pain relief from his medication regimen but the therapist reported Plaintiff appeared comfortable. *Id*. On examination, Plaintiff did not show any limitation in movement and had a full range of motion and a steady gait. The therapist recommended Plaintiff have six sessions. *Id*.  He underwent therapy on January 10, 2019, but did not appear for therapy on January 15. *Id*. at 143, 146. During physical therapy on January 17, 2019,  he reported feeling better. *Id*. at 147.  On January 22, 2019, he had therapy; he reported experiencing numbness a couple days earlier that did not last. *Id*. at 148. During his physical therapy on January 24, 2019, Plaintiff reported feeling much better and did not appear for his scheduled session on January 29. *Id*. at 149, 150.  On January 31, 2019, he attended therapy and again reported feeling better. *Id*. at 151.

Dr. Sisay evaluated Plaintiff again on February 5, 2019. At that time Plaintiff reported that physical therapy helped and his pain was controlled with his current medication. ECF No. 42-4  at 8, ¶ 26; ECF No. 42-5  at 155-56.  He denied experiencing any limb weakness or incontinence, appeared in no distress, and did not exhibit any abnormalities of the back or spine. *Id*.  Dr. Sisay renewed Plaintiff's medications. *Id*.  Two days later, Plaintiff returned to physical therapy and again reported feeling much better.  ECF No. 42-5 at  160.

Plaintiff underwent a CT scan of his lumbar spine on February 11, 2019. ECF No. 42-5 at 224-225.  The scan suggested severe central canal stenosis and multi-level broad based disc bulges. *Id*.

The following week, on February 19, 2019, Plaintiff was transferred to Baltimore City Correctional Center (BCCC). ECF No. 42-5 at 161-63. He was evaluated by a physician and Plaintiff reported physical therapy had helped his complaints of back pain. *Id*. The physician

11

noted that the results of the recent CT scan were not available and he ordered Plaintiff's pain medications be continued. *Id*. at 162.

On April 5, 2019, Plaintiff was taken to the medical unit at BCCC because it was suspected he was under the influence of K2, a synthetic cannabinoid. ECF No. 42-5 at 171.  Two months later, on June 6, 2019, he was again taken to the medical unit at BCCC on suspicion of using an illegal substance. He was placed in a single cell for observation. *Id*. at 178.  The following month, on July 6, 2019, Plaintiff was again taken to the medical unit for suspicion of taking an illegal substance and was placed in a holding cell for observation. *Id*. at 186.

Plaintiff was transferred back to MCIJ on or about September 15, 2019. ECF No. 42-5 at 194.

Dr. Sisay evaluated Plaintiff on October 1, 2019. At that time Plaintiff reported his pain was "markedly controlled" after physical therapy and on his current medication. ECF No. 42-5 at 198. He denied limb weakness or incontinence and did not exhibit any significant physical lumbar spine findings.  Dr. Sisay renewed Plaintiff's medication and directed he continue the exercises for low back pain. *Id*.

Plaintiff was evaluated by NP Tchoumba on October 24, 2019, November 6, 2019, November 18, 2019, and December 26, 2019 for a variety of complaints, none of which concerned his back pain. ECF No. 42-5 at 204-9, 222-23.

Dr. Sisay next evaluated Plaintiff on January 8, 2020. ECF No. 42-5 at 230-32. Plaintiff again reported good pain control after physical therapy and on his prescribed medication. *Id*. No significant lumbar spine findings were noted. Dr. Sisay again renewed Plaintiff's medications and advised him to continue the exercises for his lower back. *Id*.

NP Tchoumba saw Plaintiff on February 10, 2020. At that time, Plaintiff requested that his prescription for Flomax and a medication to treat an enlarged prostate (Cardura) be discontinued. ECF No. 42-4 at 10, ¶ 35; ECF No. 42-5 at 239-40.  He again did not express any complaints regarding his back. *Id.*

Ten days later, NP Tchoumba again evaluated Plaintiff. ECF No. 42-6 at 241-42. Plaintiff complained of left hip pain and pain in his calves and complained that Baclofen, Indomethacin, and Amitriptyline (Elavil) were not effective in treating his pain. *Id.* No redness, swelling or deformities were observed. While Tchoumba noted that Plaintiff walked with a limp, she did not note any impairment of Plaintiff's activities of daily living.  She prescribed Mobic in place of Indomethacin and advised Plaintiff to do routine stretching exercises. *Id.* Tchoumba also ordered a hip x-ray which was taken the following day.  *Id.*; ECF No. 42-4 at 11, ¶ 37; ECF No. 42-5 at 308.  The x-ray showed degenerative changes in the bilateral hip joint, indicating arthritis in the joints. *Id.*

Plaintiff was examined by a provider on March 1, 2020. At that time Plaintiff had normal range of motion in his left hip and no tenderness over the left hip.  ECF No. 42- 4 at 11, ¶ 38; ECF No. 42-5 at 243-44. Biofreeze, a topical pain medication, was ordered. Subsequently, Plaintiff reported he did not receive the Biofreeze and Dr. Sisay approved the medication on behalf of the regional medical director. ECF No. 42-5 at 11, ¶ 39; ECF No. 42-5 at 246-49.

On March 19, 2020, Dr. Sisay evaluated Plaintiff. ECF No. 42-4 at 11, ¶ 40; ECF No. 42-5 at 250-58. Plaintiff reported his pain was not fully controlled. On examination, Plaintiff was not in distress, did not have acute tenderness or swelling in the hip joint, and denied limb weakness or incontinence. *Id.* He showed limitation of movement in the left hip joint with flexion and rotational movements. *Id.*  Dr. Sisay explains that arthritis (degenerative joint

disease) is treated with NSAIDs and that Mobic is an NSAID. *Id.* As a result of the examination, Dr. Sisay doubled Plaintiff's prescription for Mobic and continued the remainder of Plaintiff's pain medications including Amitriptyline, Biofreeze and Baclofen. *Id.* Dr. Sisay avers that based on his examination of Plaintiff, he believed his actions were the appropriate course of conduct for Plaintiff's condition. *Id.*

A week later, Plaintiff was seen by NP Yvette Ledjo. ECF No. 42-5 at 253-54. Plaintiff reported pain in his hips, knees, and back. *Id.* Ledjo discontinued Plaintiff's prescription for Amitriptyline and prescribed Cymbalta, an antidepressant also used to treat pain. *Id.* NP Ledjo renewed Plaintiff's medication on April 16, 2020. *Id* at 255.  On April 23, 2020, she examined Plaintiff who reported improvement in his pain with Cymbalta. *Id.* at 256-577. She next saw Plaintiff on May 15, 2020, for an unrelated medical complaint. *Id.* at 258-59.

Plaintiff returned to Dr. Sisay for treatment on May 28, 2020. ECF No. 42-5 at 260-61. Plaintiff reported that his current medication regimen was helping.  *Id.* Dr. Sisay renewed Plaintiff's prescriptions and advised him to continue his low back exercises.  *Id.*

NP Ledjo saw Plaintiff again on July 11, 2020, due to his complaint of hip pain.  ECF No. 42-5 at 263-64.  Ledjo renewed the order for bottom bunk status and prescribed glucosamine chondroitin. *Id.*  Two weeks later, Ledjo again evaluated Plaintiff for medical complaints not related to his back.  *Id.* at 265-66.

On July 29, 2020, Dr. Sisay examined Plaintiff. ECF No. 42-5 at 268-70.  Plaintiff advised that his current medications were helpful. Dr. Sisay renewed Plaintiff's prescriptions and advised Plaintiff to continue with the exercises for his lower back. *Id.*

On August 13 and 29, 2020, NP Ledjo saw Plaintiff regarding his high blood pressure. ECF No. 42-5 at 273-76.

Shortly thereafter, Plaintiff requested an increase in pain medication and was seen on September 4, 2020, by NP Ledjo. ECF No. 42-5 at 277-78.  Ledjo reviewed Plaintiff's medication list. On examination, Plaintiff was not in distress, showed normal musculature with no skeletal tenderness or joint deformity. *Id*.  Ledjo advised Plaintiff regarding his condition, discussed the benefits of his medication, and advised him to continue the current medications and return to the clinic if his condition worsened or did not improve. *Id*.

Ledjo again evaluated Plaintiff on September 14, 2020, after Plaintiff again requested an increase in pain medication.  ECF No. 42-5  at 279-80.  Ledjo noted she would request a copy of Plaintiff's CT scan for potential consultation with the pain management panel. *Id*.

On October 5, 2020, Ledjo met with Plaintiff to review his CT scan.  ECF No. 42-5 at 283-84.  Ledjo requested a pain management consultation and submitted a behavioral health consultation request after Plaintiff threatened to "get medical attention by all mean[s] including jumping from the top." *Id*. at 281-86.  The following day, Ledjo added Tylenol to Plaintiff's prescribed medications. *Id.* at 287-88.

Plaintiff was evaluated for pain management by the clinical pharmacist on October 7, 2020. ECF No. 42-5 at 289-90.  The pharmacist recommended prescribing Tylenol (acetaminophen) based on Plaintiff's report that it was helpful. *Id*.  It was further noted that Plaintiff was on the maximum dosages of Cymbalta, Mobic, and Baclofen. *Id*.

Kimberly Battle, the Assistant Director of Nursing (ADON) at MCIJ does not recall any interactions with Plaintiff, including as to his treatment or complaints of pain.  ECF No. 42-9 at 3, ¶ 6.  Battle has no authority to prescribe medication, dictate the course of treatment, request off-site care, or request a consultation with the pain management panel. *Id.* at ¶ 5. Nor does

Battle manage the schedule of the pain management panel. *Id.*  Battle was not aware of any medical complaints that were not addressed by Plaintiff's medical providers. *Id.*

If Plaintiff had brought a complaint to Battle's attention she avers that she would have investigated and attempted to address the complaint by notifying the appropriate health care provider of the complaint. *Id.* at 3, ¶ 6. As to Plaintiff's claim that Battle informed him that his consultation with the pain management panel had been cancelled, Battle avers that she has no authority regarding any aspect of the panel. *Id.* She further explains that she did not render any medical treatment to Plaintiff. *Id.* at 2, ¶ 3. Lastly, she explains that had she informed Plaintiff that the panel had been canceled, she would have advised Plaintiff to follow up with his primary care provider. *Id.*

On October 21, 2020, Plaintiff was transferred to CMCF. ECF No. 42-5 at 294-96.  That same day Plaintiff was evaluated by Dr. DeRosa in chronic care. *Id.* Plaintiff reported pain in his lumbar spine, calf, knee, hip and left knee. *Id.*  Dr. DeRosa increased Plaintiff's prescriptions for Baclofen and Tylenol, and continued his prescriptions for Cymbalta, glucosamine-chondroitin, and Mobic. *Id.* Additionally, Dr. DeRosa noted he would reevaluate Plaintiff in three weeks to determine the effect of the adjustment of the medications. *Id.*  That week, Dr. DeRosa reviewed Plaintiff's lab work and noted minor abnormalities.  *Id.* at 297.

Dr. Obsu noted, on November 3, 2020, that Plaintiff requested to be transferred to another facility for pain management. ECF No. 42-5 at 299-300.

On November 16, 2020, Dr. DeRosa examined Plaintiff due to a rash on his scalp and difficulty urinating. ECF No. 42-5 at 301-02. Plaintiff did not offer any complaints regarding his back or pain management. *Id.*

Dr. DeRosa had a telemedicine meeting with Drs. Temesgen and Sisay on November 18, 2020, to discuss Plaintiff's pain management regimen. ECF No. 42-5 at 303-04. The physicians decided to discontinue Cymbalta and instead prescribe Elavil and to increase the dose of Neurontin (Gabapentin). *Id.* They also agreed to transfer Plaintiff to a location where controlled substances could be given. *Id.* Dr. DeRosa noted that Plaintiff was willing to try Lyrica as a next step and to consider Tramadol if Lyrica was not successful. *Id.*

That same day Plaintiff was transferred to DRCF. ECF No. 42-5 at 310-11. NP Mijere saw Plaintiff on December 8, 2020, following his release from quarantine and requested a chronic care appointment to address Plaintiff's pain management concerns. ECF No. 42-5 at 355-60.

NP Mijere again evaluated Plaintiff on December 16, 2020. ECF No. 41-5 at 361-62. At that time Plaintiff complained of scalp rash, high blood pressure, and reflux. *Id.* He expressed no other complaints. *Id.*

On December 21, 2020, Plaintiff was seen by Dr. Onabajo in chronic care. ECF No. 42-5 at 363-70. Plaintiff reported chronic back pain radiating bilaterally to his lower extremities. He also reported difficulty standing for a prolonged period and advised Onabajo that he had been transferred to DRCF after exhausting all non-opioid options for pain relief. *Id.* Plaintiff declined a prescription for Lyrica because of its side effects. Dr. Onabajo offered Tramadol, an opioid-like pain medication, and to adjust the prescription until Plaintiff's pain was controlled. *Id.* at 366. Dr. Onabajo explains that given the risks associated with opioids and opioid-like medications it is appropriate to initially prescribe them at a lower dose, to assess a patient's response to the medication and then adjust as necessary. ECF No. 42-10 at 5, ¶ 12. Plaintiff accepted the Tramadol. ECF No. 42-5 at 366. Dr. Onabajo renewed Plaintiff's other

17

prescriptions, including the prescription for Baclofen and glucosamine-chondroitin, and requested a neuro-surgical consultation. *Id*. at 363-64, 369.

On December 28 and 30, 2020, NP Mijere saw Plaintiff for complaints of allergies and work clearance, respectively. ECF No. 42-5 at 371-374.

The following day, on December 31, 2020, Plaintiff was evaluated by Dr. Onabajo and he reported that the Tramadol was not working. ECF No. 42-5 at 375-764.  Dr. Onabajo offered to discontinue or increase the medication or refer Plaintiff to the pain management panel. Plaintiff agreed to an increase in dosage. *Id*.

The following week, NP Mijere saw Plaintiff due to his complains of back pain.  ECF No. 42-5 at 377-78.  Mijere noted that Plaintiff was waiting to be seen by the pain management panel. *Id*.  Mijere prescribed a topical analgesic which Plaintiff later declined. *Id.* at 377-78, 385.

On January 12, 2021, at Plaintiff's request, NP Mijere prescribed Mobic. ECF No. 42-5 at 394. The next day, Dr. Onabajo noted Plaintiff's neurosurgical consultation was approved. *Id*. at 381-82.  Dr. Onabajo submitted a consultation request on January 25, 2021, for an MRI for the lumbar/sacral spine. *Id*. at 388.

On February 2, 2021, Plaintiff reported to NP Mijere that his pain medication was not working. ECF No. 42-5 at 386-87. Because Plaintiff's medication regimen exceeded the scope of Mijere's practice she referred Plaintiff to the chronic care clinic. *Id*.

Two days later, Dr. Onabajo examined Plaintiff. ECF No. 42-5  at 390-91. Plaintiff reported that Tramadol was ineffective. *Id*.  Examination revealed Plaintiff had decreased lumbar mobility and paravertebral muscle spasm. He complained of posterior tenderness. Dr. Onabajo recounted Plaintiff's history and noted Plaintiff would meet with the pain management panel. *Id*.

On February 17, 2021, Dr. Onabajo, Dr. Temesgen, and a clinical pharmacist discussed Plaintiff's pain management plan while awaiting results from this CT scan and neurological evaluation. ECF No. 42-5 at 399-401. The pharmacist offered Cymbalta but Plaintiff advised that it did not work. *Id*. Plaintiff also reported that the Mobic he was prescribed was for his hip pain. *Id*. Dr. Temesgen recommended the narcotic medication Tylenol #3 while awaiting Plaintiff's neurosurgical consultation. *Id*.

On February 22, 2021, Dr. Onabajo requested a CT scan with contrast of Plaintiff's lumbar spine. ECF No. 42-5 at 403.  On March 2, 2021, Dr. Onabajo discussed the results of Plaintiff's lab work with him and advised that they were still awaiting the scheduling of the neurosurgical consultation. *Id*. at 407-08.

Dr. Neal Naff evaluated Plaintiff on March 25, 2021, for Plaintiff's complaints of back pain, lower extremity pain, and gait dysfunction.  ECF No. 42-7 at 933-35.  Plaintiff advised that he had aching throbbing pressure of 8 on a 10-point scale, radiating to the right side of his buttock, hip, and hamstring with numbness and tingling when standing more than 5 minutes. *Id*. He reported that his symptoms had progressively worsened and physical therapy provided temporary relief. *Id*.  On examination, Dr. Naff noted, Plaintiff sat in no apparent distress and moved his lower extremities bilaterally with 5/5 strength. *Id*.  Dr. Naff noted slightly positive nerve root tension in the left leg but there were normal sensation and reflexes.  Plaintiff reported tenderness to palpation with a light touch and showed an altered gait but was able to stand without issue. *Id*.  Dr. Naff recommended a CT with myelogram which Dr. Onabajo requested. *Id*. at 424; ECF No. 42-10 at 7, ¶ 21.

On March 29, 2021, Dr. Onabajo requested a referral to the pain management panel. ECF No. 42-5 at 427. He also requested a follow-up with Dr. Naff after the completion of the CT myelogram. *Id*. at 435.

The pain management panel convened on April 14, 2021. ECF No. 42-5 at 441. Plaintiff reported that he did not get any relief with Tylenol #3.  The panel decided to "optimize" Plaintiff's Gabapentin/Neurontin and also prescribed the narcotic Oxycodone for three weeks while Gabapentin was being titrated to an effective dose. *Id*.  Dr. Onabajo requested the Oxycodone and Dr. Temesgen approved the request. *Id*. at 443-44.

On April 15, 2021, a CT myelogram was attempted, however, during the procedure Plaintiff experienced pain radiating down his right lower extremity.  ECF No. 42-7 at 176-78. Plaintiff "thrashed" on the fluoroscopy table while the contrast was being injected into the spinal canal which caused the needle to dislodge.  Attempts were made to replace the needle, but Plaintiff continued thrashing and was not able to withstand the procedure. *Id*. Dr. Onabajo avers that he was not aware of the instructions regarding preparation for the CT scan and was not involved in providing those instructions to Plaintiff.  ECF No. 42-10 at 7-8, ¶ 25.  However, Dr. Onabajo further avers that Plaintiff's water intake before the procedure should have had no bearing on its success. *Id*.

Plaintiff did receive a CT of his spine. ECF No. 42-7 at 172-73.  The CT of Plaintiff's lumbar spine showed a disc herniation at L4-5, a disc bulge at L2-L3, and possible thickening of the nerve roots in the lumbar spine. *Id*. After the scan, Plaintiff was returned to the facility and was verbally responsive and walked steadily. ECF No. 42-5 at 448-49.

On April 19, 2021, Plaintiff refused the neurosurgery follow up.  ECF No. 42-5 at 452; ECF No. 42-7 at 252.  That same day NP Mijere saw Plaintiff for complaints of mild/moderate

back pain. ECF No. 42-5 at 453-54.  He denied bowel or bladder dysfunction, numbness or weakness. *Id*. Mijere continued Plaintiff's medication and directed Plaintiff to stop weight or heaving lifting, working, and yard activity. She advised him to follow up within the week if his condition worsened or did not improve. *Id*.

The following day, Dr. Onabajo saw Plaintiff and advised him that he was scheduled for follow up with Dr. Naff. ECF No. 42-5 at 457. Plaintiff advised that he wanted to hold off on the follow up or any further appointments until he spoke to his attorney. *Id*.

Dr. Onabajo next saw Plaintiff on May 6, 2021. ECF No. 42-5 at 463-64. At that time, Dr. Onabajo requested a renewal of Plaintiff's Oxycodone prescription which was approved by Dr. Temesgen. *Id*. at 461-62.

Throughout June 2021, Plaintiff was seen by a variety of nurses and each reported Plaintiff walked with a steady gait. ECF No. 42-8 at 287-298.

Plaintiff was transferred to a different facility on June 22, 2021. ECF No. 42-8 at 299. Upon his transfer a physician noted Plaintiff reported tremendous pain but outwardly did not appear to be in pain. *Id*. at 328-29.  The physician observed Plaintiff go from sitting on the bunk to standing rapidly with no limits or outward sign of pain. He was also seen standing for significant periods of time. On one occasion Plaintiff was observed walking backwards without issue and sat down on the bunk as asked. *Id*.

On June 30, 2021, Plaintiff requested to sign off on receiving narcotics so that he could be transferred to a different area of the facility.  ECF No. 42-8 at 335. In July of 2021, Plaintiff was again prescribed Neurontin for pain control. *Id*. at 343-46.

At the time Corizon Defendants filed their dispositive motion, Plaintiff's condition continued to be monitored. ECF No. 42-8 at 352.

### C.    Procedural History

Beckles, proceeding pro se, brought the instant civil action against Defendants on January 28,

2021, alleging claims for deliberate indifference and supervisory liability under 42 U.S.C.

§ 1983. ECF No. 1. On September 10, 2021, Corizon Defendants and Wexford Defendants filed

Motions to Dismiss or, in the Alternative, Motions for Summary Judgment, ECF Nos. 42 and 43,

respectively. Beckles filed a declaration on February 22, 2022.[3]  ECF No. 49. The Corizon

Defendants replied. ECF No. 50.

## II.    DISCUSSION

### A.    Defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment

#### 1.    Standards of Review

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do")).

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve

contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v.*

---

[3] Beckles' "declaration" concerns the alleged denial of medical care occurring at his current place of confinement and does not oppose the motions filed by Defendants. ECF No. 49.

*City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint[,]" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Defendants' Motions are styled as Motions to Dismiss or, in the Alternative, Motions for Summary Judgment. If the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. When the moving party styles its motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322-23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when the nonmovant has not had the opportunity to discover information that is essential to his

opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (internal citation and quotation marks omitted). To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery "could possibly create a genuine issue of material fact sufficient . . . to survive summary judgment, or otherwise affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015) (internal citation and quotation marks omitted).

Moreover, where, as here, the plaintiff is proceeding pro se, the Court reads the pleadings generously. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At the same time, the Court must also fulfill its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted).

### 2.      Beckles' Medical Claim

The main thrust of Beckles' § 1983 claims is that Defendants have been deliberately indifferent in regard to Plaintiff's serious medical needs.  ECF No. 1.  "Deliberate indifference to serious medical needs of prisoners constitutes 'unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.'" *Powell v. Erwin*, 927 F.2d 596 (4th Cir. 1991) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Court finds Beckles' claims are properly analyzed under the Eighth Amendment of the United States Constitution.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, Beckles must demonstrate that Defendants' acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (explaining that there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (noting that failure to provide a diabetic inmate with insulin, where physician acknowledged it was required, is evidence of an objectively serious medical need).

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison

official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as "exacting"). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation "absent exceptional circumstances." *Scinto*, 841 F.3d at 225. Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977)).

### a.  Defendant Battle

Beckles' allegations that he "sought help" from Battle is insufficient to rise to the level of deliberate indifference.  Battle avers that she was not involved in Plaintiff's medical treatment and had no authority to dictate any aspect of Plaintiff's treatment, including the prescription of analgesic medication. Battle's sole role as Administrative Director of Nursing was to investigate Plaintiff's informal complaints and attempt to address those concerns through her role as a registered nurse. Beckles fails to state an Eighth Amendment claim for deliberate indifference or supervisory liability. While Beckles has sufficiently plead the seriousness of his medical

condition, his bare allegations that he sought help from Battle and Battle failed to address his concerns are insufficient to demonstrate that Defendant Battle recklessly disregarded a substantial risk of harm to Beckles. *See Farmer*, 511 U.S. at 839.

Moreover, liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. If a plaintiff has not alleged any personal connection between a defendant and a denial of their constitutional rights, the claim must fail. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Rather, liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Consequently, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Beckles fails to plead any factual details indicating that Defendant Battle had actual or constructive knowledge of a subordinate's behavior that risked constitutional injury to Beckles,

nor has Beckles alleged that Defendant Battle interfered with any medical provider's performance or tacitly authorized a constitutional violation. The Court thus dismisses Beckles' § 1983 claim against Defendant Battle for failure to state a claim.

### b.    The Wexford and Corizon Defendants

The Wexford and Corizon Defendants argue they are entitled to summary judgment as the undisputed facts demonstrate that the Wexford and Corizon Defendants were not deliberately indifferent to Beckles nor did they ignore Beckles' medical needs. ECF Nos 42 and 43.  As Beckles has not filed an affidavit under Rule 56(d) or proffered any other grounds that summary judgment is unwarranted at this time, the Court will convert  Defendants' Motions to Dismiss or, in the Alternative, Motions for Summary Judgment into motions for summary judgment with respect to Beckles' § 1983 claims against the Wexford and Corizon Defendants.

As discussed above, to demonstrate deliberate indifference to a serious medical need, Beckles must show that he was objectively suffering from a serious medical need and that, subjectively, Defendants were aware of his need for medical attention and failed to provide it or ensure that it was made available to him. *See Farmer*, 511 U.S. at 834-37.

During the relevant time period, Defendants responded to Beckles' reports of back pain. Although Beckles' transfer between correctional facilities delayed the provision of prescribed medical care and/or diagnostic treatment at various times, there is no evidence that any of the named Defendants were responsible for the transfers.

To the contrary, the record evidence demonstrates a sincere effort by the named medical providers to treat Beckles' reported back pain and provide appropriate analgesic pain relief while balancing Beckles' past addiction issues and CDC recommendation against the use of opioids. Defendants regularly adjusted Beckles' analgesic pain medication, convened a pain management

panel, and consulted with clinical pharmacists in order to treat Beckles' reported pain. Ultimately, having exhausted all efforts at providing non-narcotic pain relief, Defendants worked together to have Beckles' transferred to a facility where he could receive narcotic pain relief. Beckles' allegations that Defendants were deliberately indifferent to his need for pain management is contradicted by the medical records.

Further, in addressing Beckles' complaints, medical providers ordered physical therapy which Beckles reported provided relief for his back pain. They also provided Beckles with a back brace, topical analgesics, and bottom bunk status. Lastly, medical providers also referred Beckles for additional diagnostic testing and consultations with outside specialists.

Beckles claims that he was provided erroneous advice regarding the preparation for his CT myelogram. He provides evidence that he was directed to refrain from drinking water prior to the scan and this lack of hydration caused him pain and prevented the scan from being performed. While it appears undisputed that he did not need to refrain from drinking water prior to the scan, Dr. Onabajo avers that Beckles' hydration should have had no bearing on the ability to perform the test. Moreover, even if the erroneous advice did impact the ability to perform the CT myelogram, there is no evidence before the Court that the provision of the incorrect advice was anything more than mere negligence which is insufficient to sustain a § 1983 claim.

Lastly, after Beckles underwent the diagnostic testing and Defendants endeavored to schedule his return to the neurosurgeon for interpretation of the results of the testing and next steps, Beckles refused to be seen by the neurosurgeon opting instead to consult an attorney. Thereafter, Beckles declined his prescription for narcotic analgesic medications so that he could be transferred to a part of the facility he desired. Beckles' conduct demonstrated that it was his actions that thwarted the ability to fully treat his complaints of back pain.

Viewing the evidence in the light most favorable to Beckles, the Court cannot find that the medical staff were deliberately indifferent to his needs. Beckles was scheduled for sick calls and provider visits, his condition was continuously evaluated, his medication was adjusted, he was provided physical therapy and orthopedic devices, he was referred for diagnostic testing and consultation with outside specialists.  None of the medical staffs' decisions amount to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Moreover, an Eighth Amendment claim is also not presented where, as here, Beckles alleges that he was not provided the exact medical treatment that he desired. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

3.      Retaliation

Beckles' retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected their First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

31

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. *Id*.

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989). Moreover, a retaliation claim fails if there is another legitimate reason for the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Beckles asserts without support that he was retaliated against for filing complaints about his medical care. He does not explain the nature of the retaliation, who engaged in the retaliation, or when the retaliation occurred.  Beckles has failed to state a sufficient claim of retaliation.

    4.       Injunctive Relief

As a preliminary injunction temporarily affords an extraordinary remedy prior to trial than the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate: (1) by a "clear showing" that he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-23 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292-93 (4th Cir. 2011).  "All four requirements must be satisfied." *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) (brackets omitted); *see also Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (noting that Fourth Circuit's prior test of balancing the factors is no longer good law in light of *Winter*). Beckles' request for injunctive relief shall be denied, as he does not clearly satisfy all four factors.

As summary judgment is granted in favor of Defendants on Beckles' medical claim, he cannot show a likelihood of success on the merits. Moreover, in the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). Such circumstances are not present here.

Additionally, Beckles has failed to demonstrate a likelihood of suffering irreparable harm if the relief is not granted. As to irreparable harm, the movant must show the harm to be "neither

remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Grp.,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In regard to Beckles' claim that he was denied adequate medical care, Beckles may file sick call slips seeking the referral to the neurosurgeon that he previously declined, reinstatement of his narcotic pain medication, that he also voluntarily withdrew, as well as whatever additional medical care his providers feel is appropriate.  Beckles has failed to demonstrate that the balance of equities is in his favor or that an injunction would be in the public interest.

## III.   CONCLUSION

For the foregoing reasons, Defendant Battle is DISMISSED; and the Wexford and Corizon Defendants' Motions to Dismiss, or in the Alternative, Motions for Summary Judgment ARE GRANTED.

A separate Order follows.


Date:  June 30, 2022                          /s/_____

                                                       GEORGE J. HAZEL
                                                       UNITED STATES DISTRICT JUDGE

34